### HIGGIE and others *v.* AMERICAN LLOYDS.

*(District Court, N. D. Illinois.  November 5, 1882.)*

1. MARINE INSURANCE—REPRESENTATIONS—AS PART OF CONTRACT.

    A positive representation as to a material fact is as essentially a part of the contract as a warranty, and must be substantially true, or if untrue it will operate as a release of the obligor thereunder.

2. MARINE RISK—POLICY, WHEN VOID.

    On a voyage policy of insurance whereby the underwriters assumed to insure the freight list of a vessel "lost or not lost" for a voyage at sea, the condition of a vessel in respect to her seaworthiness, at the time of the commencement of the risk, is a material part of the contract, and a misrepresentation in this respect will render the policy void.

3. SAME—WARRANTY—SEAWORTHINESS.

    There is an implied warranty of seaworthiness at the time of the inception of the risk in case of a marine insurance, and where a vessel encountered no extraordinary peril, and no gale or storm which would have imperiled a stanch, strong vessel, and she rolled heavily upon the waves produced merely by trade winds, and leaked badly, her unseaworthiness at the commencement of the voyage will be presumed, and unless rebutted by evidence the contract of insurance is void.

)

4. SAME—ESTOPPEL BY RECEIPT OF PREMIUM.

Where the loss had occurred before respondent became aware of the fact of unseaworthiness at the time of the inception of the risk, or of the misrepresentation as to the rating of the vessel, the fact of their not returning or offering to return the premiums paid until the hearing of the case will not estop respondent to deny the validity of the policy.

*Robert Rae*, for libelants.

*David Fales* and *C. E. Kremer*, for respondent.

BLODGETT, D. J. This is a libel on a contract of insurance made by the respondent with the libelants as owners of the schooner G. G. Cooper, whereby respondent insured the freight list of the schooner for a voyage from Las Palmas, in the Canary islands, to Rio Janeiro, Brazil, in the sum of $1,800; the certificate of insurance bearing date July 8, 1879, and having been issued from the office of the agent of the respondent in the city of Chicago on the application of the owners of the schooner.

Two defenses are urged by the respondent to the claims of the libelants: *First,* that the vessel whose freight list was so insured was not seaworthy at the time of the commencement of the risk; *second,* that the policy of insurance was obtained upon false representations as to the rating and classification of the schooner for insurance purposes by the "American Lloyds."

It appears, from the proof in the case, that the schooner in question was built upon the waters of Lake Erie in the year 1863; that she was about 310 tons burden, and what was known as a "canal vessel,"—that is, a vessel narrow enough to pass through the Welland canal; that in the season of 1878 she was taken through the canals to Montreal, and there inspected by the agents of the "American Lloyds," and classed for insurance purposes A 1½. During the latter part of the year 1878 she made a voyage from the St. Lawrence river to Falmouth, England, with a cargo of deals, encountered much rough weather, and arrived at Falmouth considerably out of repair. From her arrival at Falmouth the American Lloyds reported the certificate of classification given by that society as suspended. At Falmouth she took on a cargo of coal for Gibraltar, and on her voyage through the Bay of Biscay met with such disaster from rough weather that she was obliged to put into the port of Cadiz, Spain, in a dismantled and wrecked condition, where she was surveyed and examined under direction of the American consul at that port and condemned to be sold as unseaworthy. At the offer of sale made in pursuance of this condemnation no bidders appeared and no sale was effected.

One of her owners shortly after arrived at Cadiz, and, under the instructions or advice of the American consul at that port, proceeded to repair the vessel, and during the winter placed such repairs upon her as he was advised entitled her to be restored to her former rating, and a certificate to the effect that she had been restored was indorsed upon the original certificate of classification given by the American Lloyds in July, 1878, by a Mr. Benjamin G. Haynes, who was represented as the agent of the American Lloyds at Cadiz. Some time during the month of March the schooner took on board a cargo of about 445 tons of salt, to be transported from Cadiz to the port of Rio Janeiro, Brazil. She also had on board, besides her crew, about twenty passengers for Rio Janeiro. She sailed from Cadiz upon her voyage to Rio Janerio about April 17, 1879, made the port of Tangiers, Morocco, where she remained a few days, and, proceeding on her voyage, arrived at Las Palmas, in the Canary islands, about the nineteenth of May. From this point her master addressed a letter to W. F. Higgie, one of her owners in this city, which was received here in due course of mail, stating that he would sail from Las Palmas in continuation of his voyage on the twenty-first of May, and on that day he did set sail in prosecution of his voyage from Las Palmas, and shortly after leaving that port encountered a heavy sea, causing the vessel to roll badly, and during the night of the 21st and the morning of the 22d the vessel was found to be leaking to such an extent that the master, at the instance of his crew and passengers, deemed it best to make a port of safety, and accordingly put in at the port of Santa Cruz, in the island of Teneriffe, distant from Las Palmas only about 54 miles, where she arrived on the afternoon of the 22d. Soon after the arrival at the latter port, the second mate and some of the seamen made complaint to the American consul resident there that the schooner was unseaworthy and unfit to continue her voyage, and a survey was ordered by the consul, which resulted in a report from the surveyors to the effect that the vessel was wholly unseaworthy, and unfit to pursue and complete her voyage, and such proceedings were taken by the consul that the vessel was condemned and ordered to be sold, and she subsequently was sold in the port of Santa Cruz, Teneriffe, under the order of condemnation, and her voyage to Rio Janeiro was thereby broken up. The captain not being able to obtain another vessel in which to transport her cargo to the port of destination, the salt was stored, under the direction of the consul at Santa Cruz, and no freight was earned thereon.

On or before July 8th, and after the receipt of the letter from the master, dated at Las Palmas, W. F. Higgie, one of the libelants residing here, applied to the agency of the respondent in this city for insurance of $1,800 upon the freight list of the schooner. The agent had in some way become advised of the fact that the schooner had been condemned the winter before at Cadiz, and disrated by the American Lloyds, but he was informed by Mr. Higgie that he had, under the instructions of the American consul at Cadiz, put such repairs on the vessel that she had been fully restored to her rating, and was then rated A 1½ by the American Lloyds.

Considerable testimony has been put into the record bearing upon the question of the condition of the vessel at the time she left the harbor of Cadiz, the testimony on the part of the libelants tending to show that she received repairs to the extent of over $6,000, and that after she had been so repaired the indorsement was made upon her certificate of classification, which had been given her in Montreal, stating that she had been restored to her former rating.

This being a voyage policy whereby the underwriters assumed to insure the freight list of this vessel, "lost or not lost," for the voyage from Las Palmas to Rio Janeiro, the condition of the vessel in respect to seaworthiness at the time she left Las Palmas, which was the time the risk commenced, becomes a material matter of inquiry.

The defense insists that she was unseaworthy at the time she left the port of Las Palmas, and in support of this assumption has produced the testimony of the surveyors by whom she was examined and condemned at Santa Cruz, from whose testimony it appears that her timbers were found to be badly rotted, her butts sprung, and her condition such that she would not hold her caulking nor fastenings, and could not be made seaworthy by ordinary repairs. It is therefore contended by respondent that the condition in which the vessel was found when examined at Santa Cruz is substantially the condition in which she left Las Palmas, she having been out only one day between Las Palmas and Santa Cruz, and not having encountered any very severe storm. The testimony of the master of the vessel does not, I think, justify the conclusion that the storm was of a very severe character. He says, in answer to the forty-ninth question, on his direct examination: "After we left Las Palmas she encountered heavy weather. There is a trade-wind down there which makes a very heavy sea; they shook her up pretty lively; she rolled very heavy; first one way under, and then the other way under." In answer to the fifty-first interrogatory he says: "We had to reef sails and shorten things down. Between midnight

and morning, found she was making more water than usual; at daylight was making water very badly,—so much so it was thought best to make a port of safety, and find out whether we could do anything to stop the leaks." He also says: "While in the roads at Santa Cruz she did not seem to make so much water as while at sea; found some leaks above the water which we stopped by caulking. After the recaulking everything was all right, and I was willing to proceed on my voyage."

It clearly appears from the testimony of the master that he did not think the vessel unseaworthy when she arrived at Santa Cruz, and that he did not think her condition very much changed after she arrived there from what it was when she left Las Palmas, nor did he think she had encountered such a peril of the sea as to disable her and make her unfit to perform the voyage; while it most manifestly appears from the testimony of the surveyors, who seem to have been candid and impartial men, one being the master of an English bark, another the master of a Norwegian bark which happened to be in the port of Santa Cruz at the time, and the other a ship carpenter residing at Santa Cruz, that the condition of the vessel's timbers was such from rottenness that she was not fit to complete the contemplated voyage; and I cannot, in the light of the testimony in the case, considering the history, age, and build of the vessel, believe that she was in a sound and seaworthy condition at the time she commenced this voyage; that is, at the time she left Las Palmas for Rio Janeiro. It seems very clear to me that if her timbers had been sound she could have been readily repaired from any damage she sustained on the night of the 21st, between Las Palmas and Santa Cruz, so as to have proceeded without danger upon her voyage; but it is probable that the rolling which she encountered did develop the inherent rottenness to such an extent as to cause her to leak, and to cause alarm among her seamen and passengers, who demanded the survey which resulted in her condemnation.

In *Cort* v. *Washington Ins. Co.* 2 Wash. C. C. 375, it is said:

"If a vessel, after the commencement of her voyage, becomes unfit to prosecute it, and has been exposed to no extraordinary peril of the sea, this may raise so strong a presumption of unseaworthiness at her departure as to require strong evidence to repel the conclusion."

And I must say that I do not think the libelants' testimony overcomes this presumption. There was no extraordinary peril encountered; the vessel rolled heavily upon the waves produced by the trade-

winds. There was no gale, no storm such as would have imperiled a staunch, strong vessel. Assuming it to be a well-settled rule of insurance law that there is an implied warranty of seaworthiness at the time of the inception of the risk,—which position is fully sustained by the following authorities, and many others which might be cited: 1 Parsons, Mar. Ins. 367; Phil. Mar. Ins. 378; *Hazard* v. *Ins. Co.* 8 Pet. 578; *McLanahan* v. *Ins. Co.* 1 Pet. 170,—I must hold that this warranty was broken by reason of the unseaworthiness of the vessel at the time the voyage commenced, and the risk never attached, and the policy is therefore void. If the vessel was not seaworthy at the commencement of the voyage, then this contract of insurance never became binding upon the underwriters, because the contract was made upon the implied warranty of seaworthiness.

The proof also shows quite satisfactorily that this policy was issued upon representations made to the agent of the underwriters that the schooner was, at that time, classed A $1\frac{1}{2}$ in the American Lloyds, and that this policy would not have been issued but for this representation; the American Lloyds being an association whose business is to inspect and classify vessels for insurance purposes, and this respondent as well as most underwriters of ocean risks adopting the rating or classification of the American Lloyds for the purposes of their business.

It appears from the proof that, after this vessel met with her disasters in her voyages between Montreal and Falmouth, she was disrated and reported as such in the books of the American Lloyds. I have no doubt, however, from the proof that Mr. Higgie, the owner, was informed by the American consul at Cadiz that Benjamin G. Haines was the agent of the American Lloyds, and that Higgie in good faith supposed, from the indorsement made upon her certificate of classification by him, that she had been fully restored to her rating in the American Lloyds.

The proof, however, is conclusive to my mind that Mr. Haines was not the agent of the American Lloyds at Cadiz, and had no authority for or on behalf of that association to give this vessel a rating or classification, or to restore her to the classification from which she had been suspended; and while there is no proof going to show there was any intentional fraud on the part of the owner of this vessel in making the representation to the insurance company that she had been restored to her rate, yet there is no doubt in my mind that he would not have obtained this policy but

for the representations that this restoration had been made by an agent of the American Lloyds, and that the agents of the respondent acted upon the belief that she had been so restored, while the contrary was true. This undoubtedly is such a misstatement in regard to a material fact touching this risk as makes this contract void between the parties. "A positive representation as to a material fact is as essentially a part of the contract as a warranty, and must be substantially true; and, if untrue, releases the insurer." *Hazard* v. *Ins. Co.* 8 Pet. 578; *Sawyer* v. *Ins. Co.* 6 Gray, 221; *Curry* v. *Ins. Co.* 10 Pick. 535; *Wilber* v. *Ins. Co.* 10 Cush. 446; *Kimball* v. *Ins. Co.* 9 Allen, 540; *Campbell* v. *Ins. Co.* 98 Mass. 381.

It is a noticeable and somewhat suggestive fact in connection with this branch of the case that the testimony of neither the consul at Cadiz nor Haines has been taken by the libelants for the purpose of showing upon what authority they made this statement to Capt. Higgie to which he has testified. I think the fair presumption from the absence of their testimony is that it would not have benefited the libelants' case. I must, therefore, conclude—*First*, that the the policy never attached to this freight list, by reason of the breach of the warranty of seaworthiness of the vessel; and, *second*, that the policy was issued by reason of such a misstatement as to the facts in regard to the classfication and rating of the vessel as make it void against the respondents.

There was, however, no offer to return the premiums received for this policy by respondent until the hearing of the case, when the premium was paid into court for the benefit of respondent; and it is insisted on the part of libelants that by retaining the premium after notice of the loss respondent has estopped itself from claiming that the policy was void by reason of the breach of the implied warranty of seaworthiness, or by reason of having obtained the insurance upon a misstatement of facts. But the loss had occurred before respondent became aware of the fact of unseaworthiness at the time of the inception of the risk, or of the misrepresentation as to the facts of rating. If, before the loss occurred, respondent had become aware of the breach of warranty, or that the policy was obtained by misrepresentation, and still retained the premium, the doctrine of estoppel *in pais* might have been, perhaps, properly invoked, but no injury has come to libelants by the failure to return this premium since the loss accrued, nor have they been induced to do any act which they would not have done if the premium had been returned or offered to them; and I have no doubt that it

having now been paid into court for the libelants, this objection will not avail the libelants.

The order will be that the money paid into court be paid to the libelants, and the libel dismissed, with costs against libelants.