PACIFIC COAST S. S. CO. v. BANCROFT-WHITNEY CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1899.)

No. 454.

1. ADMIRALTY—JURISDICTION IN REM—TIME OF SEIZURE.
     A court of admiralty acquires its jurisdiction over a libel in rem for breach of a contract of affreightment by the filing of the libel, and it is immaterial that the vessel is not within the territorial limits of the court at that time, where she is subsequently seized therein on alias monition.

2. SHIPPING—BILL OF LADING—CONSTRUCTION.
     Exceptions in a bill of lading introduced by the shipowners themselves in their own favor are to be construed most strongly against them.

**3.** SAME—STIPULATIONS FOR PRESENTING CLAIMS.

A provision in the shipping receipts that all claims against the steamship company or any of its stockholders for damage to the goods must be presented within 30 days from the date thereof, as a condition precedent to suing the company or its stockholders, does not cover the right to maintain a suit in rem against the ship, in which the company appears as claimant.

**4.** SAME—REASONABLENESS OF LIMITATION.

A provision in a bill of lading requiring all claims for damages to be presented within 30 days from the date thereof makes the period of limitation unreasonably short, and is therefore void.

**5.** SAME—ESTOPPEL TO DENY VALIDITY.

A shipper is not estopped to deny the validity of a provision of a bill of lading on the ground of its unreasonableness, since he does not stand on an equal footing with the carrier in accepting the bill of lading.

**6.** ADMIRALTY—STATE STATUTES OF LIMITATION.

In the exercise of their admiralty and maritime jurisdiction, the United States courts are governed solely by the legislation of congress and the general principles of maritime law. Accordingly, they are not bound by state statutes of limitation.

**7.** SAME—LIENS.

In a suit to enforce a lien given by the general maritime law for damage to cargo, a limitation of one year contained in the Code of Civil Procedure of California (section 813), which gives a lien for injuries to goods shipped on board a vessel, does not apply, although the bill of lading was signed within that state before the goods were shipped, and the freight was to be delivered at a port therein.

**8.** SAME—LACHES.

Mere delay for the full period of four years allowed by the state statutes of limitation, in bringing a suit in rem to recover damages to cargo, is not, of itself, and in the absence of exceptional circumstances from which laches would be imputable, sufficient to justify the court in declining to entertain the suit.

**9.** CARRIERS—DAMAGE TO GOODS—ASCERTAINMENT—AUCTION.

Sale by auction in a great mart of commerce is a proper method of determining the value of goods damaged in the hands of a carrier.

**10.** WITNESSES—RIGHT TO REFRESH MEMORY.

A witness may refresh his memory by the use of any written memorandum, although it was not made by himself, if he saw it while the facts therein stated were fresh in his recollection, and he knew that the memorandum as then made was correct.

**11.** INSURANCE—SUBROGATION—PARTNERSHIP—DISSOLUTION.

An insurance company which has paid a loss upon partnership goods is not prevented, by the subsequent death of one of the partners and the resulting dissolution of the firm, from maintaining a suit in admiralty, in the partnership name, to recover the amount of the loss from the carrier.

**12.** SHIPPING—INJURY TO GOODS—ACTIONS—CONTRACT AND TORT.

A libel alleged a delivery of goods to a carrier pursuant to a contract of affreightment; that, notwithstanding the contract, the goods were not redelivered to libelants in like good order as received, "but, on the contrary, said merchandise was returned to said port" of shipment "in a greatly damaged condition, by reason of having been wet with sea water during said voyage, which, by reason of the negligence of" the carrier, "gained access to the interior of said ship, where said merchandise was stowed"; and "that, in consequence of the injury and damage to said merchandise, the libelants have sustained damage," etc. *Held,* that the action was not founded upon a tort, but upon the contract of affreightment, and that the claim for damages was based upon the failure of the carrier to deliver the merchandise in good condition; the averment as to negligence being merely illustrative of the manner in which the goods were damaged.

**13. SAME—LIABILITY FOR INJURY.**

Common carriers by water are in the nature of insurers, and are liable for every loss or damage, however occasioned, unless it happens from the act of God or the public enemy, or by the act of the shipper, or from some other cause or accident expressly excepted in the bill of lading.

**14. SAME—BURDEN OF PROOF.**

Where merchandise is shipped, and the usual bill of lading given, promising to deliver the same in good order, the dangers of the sea excepted, and the goods are found to be damaged, the burden of proof is upon the owner of the vessel to show that the injury was occasioned by one of the excepted causes.

**15. SAME—UNSEAWORTHINESS—LATENT DEFECTS.**

In every contract for the carriage of goods by sea, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and his undertaking to safely carry the goods cannot be discharged because the want of fitness in the vessel is the result of latent defects.

**16. SAME—PRESUMPTIONS.**

Although it may be presumed that a vessel is seaworthy when she sails, if soon thereafter a leak is found, without the ship having encountered a peril sufficient to account for it, the presumption is that she was not seaworthy when she sailed.

**17. SAME—INJURY TO GOODS—PROXIMATE CAUSE.**

Where a steamer was run upon the beach solely because a leak had been discovered which could not be controlled, and water immediately came in over her deck, so that merchandise was injured, the proximate cause of the injury was the leak, and not the stranding of the vessel.

**18. EVIDENCE—PRESUMPTIONS—FAILURE TO PROVE KNOWN FACTS.**

When the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, would support the inferences against him.

**19. SHIPPING—PERILS OF THE SEA—EXCEPTIONS IN BILL OF LADING—BURDEN OF PROOF.**

A steamer, alleged by her claimants to have been stanch, strong, and seaworthy, and fully manned, officered, and equipped, was discovered, after being only 11 hours at sea in fair weather, to have a list, due to sea water in her between-decks. The water increased so rapidly that a few hours later it was decided to run for a harbor of refuge, where the ship was at once beached to prevent foundering. *Held*, in an action for damage to the cargo, that the burden was on the carrier to show wherein and how the leak arose, so as to bring the loss within the exception in the bill of lading as to perils of the sea.

**20. SAME.**

That burden was not discharged by simply showing that the ship was in a seaworthy condition at the commencement of the voyage, and presenting evidence which merely left in doubt the question as to how the leak arose.

**21. SAME—TRIAL—POWER OF COURT TO COMPEL EVIDENCE.**

Rather than decide the case on the legal presumptions arising from the proof, the court might have compelled the carrier to show the cause of the leak, if known, though inconsistent with the theory on which the parties were trying the case.

Appeal from the District Court of the United States for the Northern District of California.

This is a libel in rem, by shippers of goods shipped on board the steamer Queen of the Pacific, belonging to the claimants herein, to recover damages for breach of contract of affreightment. There were a large number of libels

filed, which, being of the same nature, were consolidated. The respective proctors agreed to select two cases—those of the Bancroft-Whitney Company and Hellman, Haas & Co.—for trial, as it was believed they would fairly present all the questions of law and fact that might arise in the other cases; the disposition of the others to be subject to subsequent arrangement after the final decision herein.

The libelants aver, in substance, that on or about the 28th day of April, 1888, the goods alleged to have been damaged were shipped, in apparent good order and condition, on board the steamship Queen, at the port of San Francisco, for transportation to the port of San Diego, Cal., there to be delivered in like good order and condition; that at said time the Pacific Coast Steamship Company, claimant herein, entered into a contract of affreightment with libelants for the delivery of the goods, certain perils in said agreement excepted; that the Queen sailed for San Diego with said merchandise on board; that, notwithstanding said contract of affreightment, said merchandise was not delivered to libelants, at said port, or at any other place, in like good order as received, "but, on the contrary, said merchandise was returned to said port of San Francisco in a greatly damaged condition, by reason of having been wet with sea water during said voyage, which, by reason of the negligence of said steamship company, its officers and servants, gained access to the interior of said ship, where said merchandise was stowed, to wit, on or about the 30th day of April. A. D. 1888"; that said steamship is now in the Northern district of California; that, in consequence of the injury and damage to said merchandise, the libelants have sustained damage, etc. Exceptions were filed to the libels by the claimant of the vessel, which were overruled by the court. The Queen of the Pacific, 61 Fed. 213. The claimant then filed answers to the libels. The answers admit that the said merchandise was received on board the Queen, and was not delivered at San Diego, and that it was returned to San Francisco, and was damaged by reason of having been wet with sea water; but deny "that the same was so wet with sea water during said voyage, or by reason of the negligence of said steamship company, its officers and servants, or either of them; and deny that by reason of such, or any such, negligence, sea water, or any water, gained access to the interior of said ship, where said merchandise was stowed," or at any time, or at all; deny that at the time the libels were filed the said steamship was in the Northern district of California; and aver that for four days prior thereto, and continuously thereafter, the said ship was without the Northern district of California; denies all damages. And, for a further and separate answer and defense, the claimant alleges "that said steamship Queen of the Pacific was, when she sailed from said port of San Francisco, as in said libel alleged, stout, stanch, strong, and in every respect seaworthy, and in such condition sailed from said port of San Francisco, fully and completely manned, officered, and equipped for her intended voyage, and with merchandise on freight, and a large number of  *  *  *  passengers on board of her; that she left  *  *  *  San Francisco at about the hour of 2 o'clock p. m. of April 29, 1888;  *  *  *  that no unusual incident was known to occur during said 29th of April, 1888; that, about 1 o'clock a. m. of the 30th of April, said steamship was noticed to have a slight list to starboard; that efforts were then made to correct such list by shifting freight to port in the between-decks, and burning coal mostly from the starboard bunkers; that about 2:15 or 2:30 o'clock a. m. of Monday, April 30, 1888, water was discovered to be dropping from a point in the iron bulkhead on the starboard side of the engine room, and about six (6) or eight (8) inches above the deck of the alleyway in the between-decks of the vessel; that an examination then made resulted in water being found in the between-decks of the steamship aft, such water extending about halfway from the side of the ship to the hatch coamings, but the aperture through which such water entered the vessel could not, after diligent search for the same, be discovered; that seamen were put to work passing such water down the hatches into the hold, so as to bring it within reach of the bilge pumps, and such pumps were kept in operation. notwithstanding which the water steadily increased between-decks, and the list of the vessel became so great that about the hour of 5 o'clock a. m. it was deemed by the master of said vessel prudent to make for Port

Harford with all convenient speed, which was done, and the said vessel at about the hour of 7 o'clock a. m. of said 30th day of April, 1888, was run upon the beach at said Port Harford, at which place sea water immediately came in over her deck, and nearly filled the vessel with water, and thereby said merchandise became wet with sea water; that the beaching of said steamship was necessary to prevent and avoid a total loss of said steamship, and of all the said merchandise then on board of her, and was done by the master thereof as the result of cool deliberation, and in the exercise of a wise discretion on his part as to what was best to be done, and with the purpose of saving said vessel and cargo, and of rendering entirely safe the lives of all the persons, passengers and crew, 212 in number, then on board of said steamship; that the said Pacific Coast Steamship Company, owner of said steamship, did at all times, and immediately prior to the sailing of said steamship from the said port of San Francisco with such merchandise on board of her, exercise due diligence to make the said steamship in all respects seaworthy, and properly manned, equipped, and supplied for her then intended voyage, to wit, a voyage to San Diego and way ports, and return; that the crew of said steamship was composed, during the times referred to, of persons competent to discharge the duties pertaining to their several stations on board said vessel"; that said merchandise was delivered to, received and carried by, the claimant, under and in pursuance of the laws of the state of California, and the provisions of special contracts made by the libelants and the claimant; and that said merchandise was damaged, if at all, in said state. And, for a still further and separate defense, claimant alleges: That the libels are barred by the laches of the libelants in the prosecution of the same, by the terms of the contract alleged in said libels, which reads as follows: "It is expressly agreed that all claims against the P. C. S. S. Co., or any of the stockholders of said company, for damages to, or loss of, any of the within merchandise, must be presented to the company within thirty days from date hereof, and that, after thirty days from date hereof, no action, suit, or proceeding in any court of justice shall be brought against said P. C. S. S. Co., or any of the stockholders thereof, for any damage to, or loss of, said merchandise; and the lapse of said thirty days shall be deemed a conclusive bar and release of all right to recover against said company, or any of the stockholders thereof, for any such damage or loss." That libelants did not present, or cause to be presented, to said company, within such 30 days, their claims for the damages, or any part thereof, as in said libels alleged; nor was this, or any, proceeding commenced in any court within in said 30 days, nor at any time prior to the 28th of April, 1892, at which time said steamship was not within the Northern district of California; nor was said steamship seized by the marshal under process until the 4th of May, 1892. That the libels are barred by the provisions of sections 337 and 338 of the Code of Civil Procedure of the state of California. That the same are barred by laches on the part of libelants, by delay in the prosecution of the same for such length of time as constitutes, and is, a bar to a recovery thereof in a court of admiralty.

Under the issues as thus presented, the proctor for libelants at the trial contented himself with introducing the shipping receipts as evidence of the apparent good order and condition of the goods when delivered to the carrier for shipment, and, after offering some testimony as to the damaged state of the shipment of Hellman, Haas & Co., rested their case. Thereupon claimant moved for a judgment in his favor, which was overruled by the court (The Queen of the Pacific, 75 Fed. 74); and then the claimant introduced evidence in support of the averments in the answer. This evidence did not disclose the cause of the leak, nor the exact locality where the water gained access to the vessel. The court, upon the final hearing, rendered a decree in favor of libelants. The Queen, 78 Fed. 155.

George W. Towle, Jr., for appellant.

Milton Andros, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts). The libel of each libelant is in rem against the steamer Queen of the Pacific, owned by the claimant, to recover damages for a breach of contract of affreightment, for the safe delivery of certain merchandise, in apparent good order and condition, at the port of San Diego. There are two libels, but in the discussion we shall mainly refer to but one, and the Queen of the Pacific will be mentioned as the "Queen." By a reference to the pleadings, it will be observed that there are numerous preliminary questions as to the right of the libelant to recover. These will first be discussed.

1. It is argued by the appellant that, the libelant having failed to prove that the steamer Queen was within the Northern district of California at the time the libel was filed, the court had no jurisdiction to enter any decree. This question rests upon the averment in the libel that the steamer was within the district, and the averment in the answer of the claimant that it was not. It is claimed that no evidence was offered in support of these averments, and that the burden of proof was upon the libelant to make proof in regard thereto. The learned judge who tried this case, in his opinion, stated that there was some evidence to the effect that the steamer was within the district at that time. But, be that as it may, we are of opinion that its presence or absence at that time, in the light of the other facts to which we shall refer, is wholly immaterial in order to confer jurisdiction. Conceding that no jurisdiction can be conferred in such a case until there is a seizure made within the limits of the territorial jurisdiction of the court, it does not follow that the steamer must be within such limits at the time the libel is filed. The court acquires its jurisdiction over an action upon a maritime contract of affreightment by the filing of the libel. It obtains jurisdiction over the res by a seizure of the steamer, made at that time or thereafter, within the district. The facts are that the monition was first returned not served, the steamer being without the jurisdiction of the court. An alias monition was thereafter issued, and returned served within the district. The court, having jurisdiction of the subject-matter, obtained jurisdiction over the res when it was attached by the marshal upon the alias monition. The jurisdiction of the court over the cause of action is different from its jurisdiction over the person or over the res. The jurisdiction acquired in the first case is obtained by service of process on the person; and in the second, by a seizure of the res. After the libel is filed, and process issued thereon, the court cannot proceed until, in the one case, the person has been served or appears, and, in the other, until there is an actual seizure of the res. In Cooper v. Reynolds, 10 Wall. 308, 316, the court said:

"By 'jurisdiction over the subject-matter' is meant the nature of the cause of action and of the relief sought; and this is conferred by the sovereign authority which organizes the court, and is to be sought for in the general nature of its powers, or in authority specially conferred. Jurisdiction of the person is obtained by the service of process, or by the voluntary appearance of the party in the progress of the cause. Jurisdiction of the res is obtained by a seizure under process of the court, whereby it is held to abide such order as the court may make concerning it. The power to render the decree or judgment which the court may undertake to make in the particular cause

depends upon the nature and extent of the authority vested in it by law in regard to the subject-matter of the cause."

There are numerous cases where process in rem has been issued by a federal court where the res was within the hands of a state court of co-ordinate jurisdiction. In such cases the federal court refused to dismiss the libel, but postponed action thereon until the proceedings in such court of co-ordinate jurisdiction were terminated. The E. L. Cain, 45 Fed. 367; Moran v. Sturges, 154 U. S. 256, 279, 14 Sup. Ct. 1019; Ex parte Chetwood, 165 U. S. 443, 460, 17 Sup. Ct. 385; Ex parte Johnson, 167 U. S. 120, 125, 17 Sup. Ct. 735. It must be admitted that in such cases the res is as much without the jurisdiction of the federal court as if it were without the district.

The objection to the jurisdiction of the court is not well founded.

2. The appellant claims that the proceedings against the Queen in rem are, in substance and effect, proceedings against the Pacific Coast Steamship Company, within the true intent and meaning of the special contract set out in the pleadings, and that the claimant is released by the 30-day clause of the special contract. This contention cannot be sustained. As a general rule, it may be conceded that a proceeding in rem cannot be maintained against an offending steamer, where there is no liability upon the part of the owner of the steamer to pay the libelant's claim. But the libelant is not compelled to proceed directly against the owner. He may enforce his lien against the steamer. There is a clear distinction between the two proceedings. A proceeding in rem is to enforce a lien against the offending steamer, irrespective of the ownership of it, and no personal judgment can be entered against the shipowner as such. The decree in a proceeding in rem is enforced directly against the res, by a condemnation and sale thereof, or against the obligors on the bond that stands in the place of the res, and for the purposes of the judgment is the res, while a proceeding in personam is direct against the shipowner to enforce his personal liability for a debt, wholly irrespective of any lien on the ship, growing out of the maritime contract on which the proceeding is founded. The present proceeding is not against the claimant company, or its stockholders, to enforce the payment of a debt, but it is to foreclose a lien against a steamer in which they claim an interest. The fact that the company appears and interposes a claim to the steamer does not change the legal nature of the proceeding from one in rem to one in personam, so as to bring it within the terms of the special contract on the back of the bill of lading, which are to be contra proferentes. In Leon v. Galceran, 11 Wall. 185, 189, where a writ of sequestration had been issued, under the laws of the state of Louisiana, against a vessel, to enforce the payment of the seamen's wages, the court said:

"Neither the writ of sequestration nor the process of attachment is a proceeding in rem, as known and practiced in the admiralty, nor do they bear any analogy whatever to such a proceeding, as a suit in all such cases is a suit against the owner of the property, and not against the property as an offending thing, as in case where the libel is in rem in the admiralty court to enforce a maritime lien in the property."

The contract relied upon by appellant is in the nature of a statute of limitations, prohibiting, after the lapse of a certain period, the bringing of any suit or proceeding against the Pacific Coast Steamship

Company, or against any of its stockholders, to recover damages for loss or injury to the merchandise specified in the bill of lading. It will be observed that nothing is said in the contract against the right of the shipper to enforce any lien against the ship. Is it not fair to presume that, if the steamship company intended to include in this limitation a proceeding in rem against its steamship, it would have expressed this intention in language unambiguous, clear, definite, and certain? The fact that it has not done so is to be construed most strongly against it. The rule of strict construction is always applied to such exceptions. Conditions in policies of insurance furnish the true rule upon this subject. The courts have universally held that as the insurance company prepares the contract, and embodies in it such conditions as it deems proper, it is in duty bound to use language, in the various provisions of the policy, in such a manner that the insured cannot be mistaken or misled as to the duties and burdens thereby imposed; and in case of any doubt or uncertainty as to the meaning of the words, or of inconsistent or contradictory provisions in the policy, they are to be construed most strongly against the company. Palmer v. Insurance Co., 1 Story, 360, Fed. Cas. No. 10,698; Steel v. Insurance Co., 51 Fed. 715, 722, and authorities there cited. In The Caledonia, 157 U. S. 124, 137, 15 Sup. Ct. 537, the court said: "As the exceptions were introduced by the shipowners themselves in their own favor, they are to be construed most strongly against them."

We are of opinion that the 30-day clause in the bill of lading has no application to this proceeding; but, even if it could be held that the limitation clause in the contract was applicable, it would not constitute a bar, because the limitation of time therein specified is unreasonable. Admitting that a common carrier of goods has a right to adopt rules fixing the time within which the shipper must present his claim or bring his action for damages, it does not follow that this is an arbitrary right, or that the clause in the bill of lading in the present case is reasonable. The date of the bill of lading is the date when the goods were received. The carrier might, in transporting the goods, meet with unavoidable accidents, or delay in delivering the same at the port designated, and might thereafter lose or damage the goods. The amount of the damage, if only partial, could not probably be ascertained for several days or weeks, depending upon the special circumstances of the case, and it would be unjust and unreasonable to limit the time of instituting proceedings from the date the goods were received. The limitation ought, in justice and fairness to all parties concerned, to be limited, at least, from the time when the loss or damage occurred. If not, to the time when the shipper had knowledge thereof; and a reasonable time thereafter should be given, within which the claim must be presented, or action brought thereon.

The appellees are not estopped from enforcing this rule of construction against the steamship company. As was said in Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 441, 9 Sup. Ct. 471:

"The carrier and his customer do not stand upon a footing of equality. The individual customer has no real freedom of choice. He cannot afford to

higgle or stand out, and seek redress in the courts. He prefers ·rather to ac-
·cept any bill of lading, or to sign any paper, that the carrier presents; and
in most cases he has no alternative but to do this, or to abandon his business.
Special contracts between the carrier and the customer, the terms of which are
just and reasonable, and not contrary to public policy, are upheld,—such as
those exempting a carrier from responsibility for losses happening from acci-
dent, or from dangers of navigation that no human skill or diligence can guard
against. * * * But the law does not allow a public carrier to abandon
altogether his obligations to the public, and to stipulate for exemptions which
are unreasonable and improper, amounting to an abrogation of the essential
duties of his employment."

In Express Co. v. Darnell (Tex. Sup.) 6 S. W. 765–767, a limitation
clause of 60 days from the time when the bill of lading was given
was held to be unreasonable. · The court, in discussing this ques-
tion, said:

"Any reasonable limitation contained in the bill of lading would be upheld
by the court. But it has been decided by this court that an unreasonable
restriction is not valid, even in cases to which our statute does not apply.
Railroad Co. v. Harris, 67 Tex. 166, 2 S. W. 574. Is this a reasonable limita-
tion? We think not. If it had been stipulated that a claim should be made
in 60 days from the ascertainment of the loss, the case would have been dif-
ferent. But to require a shipper to give notice of his claim within a short
period of the date of the bill of lading, without reference to the time when a
loss for the breach of the contract accrued, is to impose a restriction which in
many cases would deny a right of action, and thereby permit the carrier to
contract against his negligence, which is never allowed."

3. The questions raised by appellant as to the applicability and
effect of the sections of the Code of Civil Procedure and statute of
limitations, and the alleged laches of 'the libelant in the diligent
prosecution of his claim, will be considered together.

The fact that the bill of lading was signed within the state of
California, before the goods were shipped on board the Queen, and
that the freight was to be delivered at a port within the state, does
not bring the contract within the provisions of the statutes of Cal-
ifornia. The libelants did not bring this suit to enforce any lien
given by the state statute; and hence the provision of section 813
of the Code of Civil Procedure of California, relative to the time
of bringing actions against steamers, vessels, and boats, which de-
clares that "such liens only continue in force for the period of one
year from the time the cause of action accrued," as well as the
other provisions of the Code cited by counsel, have no application.
These libels were brought under, and by virtue of, the maritime
laws of the United States. In the exercise of their admiralty and
maritime jurisdiction, the United States courts are governed sole-
ly by the legislation of congress and the general principles of mar-
itime law, and are not bound by state statutes. New Zealand Ins.
Co. v. Earnmoor Steamship Co., 24 C. C. A. 644, 79 Fed. 368; Wil-
lard v. Dorr, 3 Mason, 91, Fed. Cas. No. 17,679; Brown v. Jones, 2
Gall. 477, 481, Fed. Cas. No. 2,017; The Key City, 14 Wall. 653.

In The J. E. Rumbell, 148 U. S. 1, 12, 13 Sup. Ct. 500, the court
said:

"The admiralty and maritime jurisdiction is conferred on the courts of the
United States by the constitution, and cannot be enlarged or restricted by the
legislation of a state. No state legislation, therefore, can bring within the

admiralty jurisdiction of the national courts a subject not maritime in its nature." The Glide, 167 U. S. 606, 622, 17 Sup. Ct. 930.

The question of laches, however, is applicable to courts of admiralty, and should be governed by the general principles of equity in regard thereto. No general principle of equity is better settled than the one which declares that a party must not be permitted to sleep over his rights, to the prejudice of the party against whom he makes a claim, who by the delay may be deprived of the evidence and means of effectively defending himself. But the question as to what is to be considered a reasonable time has not been, and cannot be, settled by any precise or definite rule, that would be applicable to all kinds and classes of cases. The proper solution of the question depends, to a great extent, upon the facts and circumstances of each particular case. What would be laches in one case might not constitute laches in another, where the facts are different. Mere lapse of time is not always the true criterion to follow, although it often constitutes an important factor. State statutes of limitations are often adopted by analogy. But in some cases courts have held a party guilty of laches for failure to bring his suit within a reasonable time, although the statute of limitations has not expired. Others have declined to dismiss the suit on the ground of laches, even where not brought within the time required by analogy of the statutes of limitation at law. The court, in determining the question, must necessarily be governed by the exercise of its sound legal discretion, with special reference to the facts.

In The Key City, 14 Wall. 653, 659, Mr. Justice Miller, in delivering the opinion of the court, said:

"The authorities on the subject of lapse of time as a defense to suits for the enforcement of maritime liens are carefully and industriously collected in the briefs of counsel on both sides, to which reference is hereby made, without specifying them more particularly. We think that the following propositions, as applicable to the case before us, may be fairly stated as the result of these authorities: (1) That, while the courts of admiralty are not governed in such cases by any statute of limitation, they adopt the principle that laches or delay in the judicial enforcement of maritime liens will, under proper circumstances, constitute a valid defense. (2) That no arbitrary or fixed period of time has been, or will be, established as an inflexible rule, but that the delay which will defeat such a suit must, in every case, depend upon the peculiar equitable circumstances of that case. (3) That where the lien is to be enforced to the detriment of a purchaser for value, without notice of the lien, the defense will be held valid under a shorter time, and a more rigid scrutiny of the circumstances of the delay, than when the claimant is the owner at the time the lien accrued."

In Southard v. Brady, 36 Fed. 560, the court said:

"It is true that there is no statute of limitations in admiralty; but courts of admiralty, like those of equity, will not lend their aid to enforce stale demands. Exceptional circumstances will sometimes lead a court of admiralty to pronounce a claim stale after a lapse of time less than the local statutory period of limitations. Where there is nothing exceptional in the case, the court will govern itself by the analogy of the common-law limitations." Bailey v. Sundberg, 1 C. C. A. 387, 49 Fed. 583, 586.

The Code of Civil Procedure of California limits the time for the commencement of actions as follows:

"Sec. 337. Within four years: An action upon any contract, obligation, or liability, founded upon an instrument in writing, executed in this state."

This proceeding was instituted on the last day of that period of time. There are no facts or circumstances which indicate that by reason of the delay appellant has been prejudiced in any of its legal rights, or prevented in any manner from making any defense that it could have made if there had been no such delay. No witnesses were absent by whom the facts could be established. In brief, there were no difficulties encountered in the path of having a fair trial. There are no special or exceptional facts or circumstances, which so often appeal to the conscience of the courts in such cases, that would, in equity, justify us in holding these libelants guilty of such laches as to deprive them of their right to maintain their libels because of their delay in instituting the proceedings herein.

4. The special contracts provide that:

"It is understood that in the settlement of any claim for loss of, or damage to, any of the above-mentioned goods, said claim shall be restricted to the cash value of such goods at the port of shipment at the date of shipment."

Appellant objects to the methods pursued by the libelants in making the proofs on this point,—both as to the cash value, and of the depreciation of value on account of the damages. The objections are purely technical. There is no showing or pretense that the result reached is erroneous. The damaged goods were sold at public auction, and it is claimed that such a sale does not represent the true market value of the damaged goods. Why not? No showing is made by appellant that any greater value could have been obtained at private sale, or that the public auction was not fairly conducted. What was the use of going through the formula and expense of having the goods appraised? The same objections could perhaps have been urged with as much, or greater, force against an appraisement, as against a public auction after due and timely notice.

In The Columbus, 1 Abb. Adm. 37, Fed. Cas. No. 3,041, Betts, J., said:

"Sale by auction is, in the great marts of commerce, so commonly resorted to by merchants to ascertain the value of deteriorated merchandise, that it may almost amount to a usage of trade. It furnishes, cheaply and promptly, all the accuracy which can be expected in any known measure of damages; and it is peculiarly fitting, in cases of this character, that the court should sanction and sustain it as the method best adapted to protect the interests of all parties concerned."

In The Columbus, 1 Abb. Adm. 97, Fed. Cas. No. 3,042, the same judge said:

"To all reasonable intents, this method of fixing the amount of injury or loss is just as obligatory on him and the vessel as a submission to arbitration, or an adjustment by mutual agreement between the parties. It does not appear that any witness, knowing the condition of the goods, considered the sale prices at all below their marketable value. The sale at auction, under such circumstances, was properly admissible as evidence of the value of the goods when landed."

The objections made upon these points were properly overruled.

5. It is claimed by appellant that the court erred in allowing the witness Haas, when testifying as to the cost of the goods, to refresh his memory from a memorandum marked "Merchandise on Steamer Queen," which the witness said was the bill, or a copy of it, which was handed to the agents of the steamer, of the goods shipped on the Queen.    The facts in relation to this memorandum, as shown by the testimony, are as follows:

"By Mr. Andros:  Q. Do you know what goods were shipped on board of her?  A. I know by the bills.  Q. Please to state— Refresh your memory from that paper, and state what they were.  Mr. Towle:  I object to any testimony from that paper.  Mr. Andros:  Q. In whose handwriting is that? A. This is in the handwriting of a clerk of ours, who was with us then, and who is with us now, in Los Angeles.  The Court:  Q. Do you know anything about that paper yourself?  A. Nothing more than I told the young man to make it out at the time.  He made it under my supervision.  Mr. Andros:  Q. I will ask you to see, as I read this, whether it corresponds with what is on the back of this bill of lading.  *  *  *  Mr. Towle:  We object to that as irrelevant, immaterial, and incompetent, whether it agrees with the memorandum or not.  Mr. Andros:  I propose to prove the cost price of these goods by Mr. Haas, and I want to simply identify these goods by that memorandum, so that he may testify as to the cost.  Mr. Towle:  So far as it has a bearing upon the question of price, if the witness proposes to testify from that memorandum as to prices, we shall object to that.  We object to these questions.  If the witness is to testify, he can as well testify from the items on the bill of lading as from the memorandum which agrees with those items.  The Court:  His memorandum probably has the prices attached.  Mr. Andros:  Yes, sir.  Q. '50 cases of canned vegetables.'  What was the price of this, Mr. Haas?  Mr. Towle:  Are you testifying from your memorandum, or from your own knowledge?  A. I am testifying from the memorandum.  Mr. Andros:  Q. Did you at the time know the cost of these goods?  A. Yes, sir.  Q. Did you buy them? A. Yes, sir.  Q. Bought them yourself here?  A. Either bought them myself, or they were bought under my supervision.  Q. So at that time you did know what they cost?  A. Yes, sir.  Q. Did you subsequently instruct that memorandum of that cost to be made?  A. Yes, sir.  Q. At the time that you made that memorandum yourself, or had it made under your supervision, were the figures therein mentioned the true cost of those goods?  A. Yes, sir.  Mr. Towle:  We ask that that answer be stricken out.  *  *  *  We submit that the only memorandum that can be used is one made by himself at the time. *  *  *  The Court:  Or under his direction.  The Witness:  It was our bookkeeper.  Mr. Towle:  But he directs somebody to make up a memorandum and that paper, and presents them to him.  That does not authorize him to testify from it.  The Court:  He goes further than that.  He said he knew it to be correct.  *  *  *  The Court:  I understood you to say that you knew that the charges there were correct at the time?  A. Yes, sir."

We have made this quotation because it shows, as clearly as any words we might express, that the objections made by appellant are absolutely untenable.  The law is well settled that a witness may be permitted to refresh his memory by the use of any written memorandum, although it is not made by himself, if he saw it while the facts therein stated were fresh in his recollection, and knew that the memorandum, as then made, was correct.  1 Greenl. Ev. (15th Ed.) §§ 436, 437;  Com. v. Ford, 130 Mass. 64, 66, and authorities there cited;  Huff v. Bennett, 6 N. Y. 337, 339;  Jones, Ev. § 880, and authorities there cited;  Milling Co. v. Walsh, 108 Mo. 277, 284, 18 S. W. 904.

6. Appellant argues, with reference to the libel of the surviving partners of the firm of Hellman, Haas & Co., that if the loss sustained

by them was paid by the Magdeburg General Insurance Company prior to the dissolution by the death of Jacob Haas, one of its members, the surviving partners have no authority to sue, because their authority was limited to a settlement of the partnership affairs as provided by sections 2458–2462 of the Civil Code of California. The contention is that under such conditions, the insurer, having paid the loss, and thereby become subrogated to the partnership rights, during the lifetime of Jacob Haas, had the right to sue in the partnership name, so long as the partnership existed, but that it could not sue, as it did in this case, in the name of the surviving partners. This contention cannot be sustained upon reason or authority.

In Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 462, 9 Sup. Ct. 469, where the libel was filed by the insurance company, the court said:

"The question of the subrogation of the libelant to the rights of the shippers against the carrier presents no serious difficulty. From the very nature of the contract of insurance as a contract of indemnity, the insurer, upon paying to the assured the amount of a loss, total or partial, of the goods insured, becomes, without any formal assignment, or any express stipulation to that effect in the policy, subrogated, in a corresponding amount, to the assured's right of action against the carrier or other person responsible for the loss, and, in a court of admiralty, may assert in his own name that right of a shipper. The Potomac, 105 U. S. 630, 634; Phœnix Ins. Co. v. Erie & W. Transp. Co., 117 U. S. 312, 321, 6 Sup. Ct. 750, 1176."

In Hall v. Railway Co., 13 Wall. 367, 370, the court said:

"In respect to the ownership of the goods, and the risk incident thereto, the owner and the insurer are considered but one person, having together the beneficial right to the indemnity due from the carrier for a breach of his contract, or for nonperformance of his legal duty. Standing thus, as the insurer does, practically in the position of a surety, stipulating that the goods shall not be lost or injured in consequence of the peril insured against, whenever he has indemnified the owner for the loss he is entitled to all the means of indemnity which the satisfied owner held against the party primarily liable. His right rests upon familiar principles of equity. It is the doctrine of subrogation, dependent not at all upon privity of contract, but worked out through the right of the creditor or owner. Hence it has often been ruled that an insurer who has paid a loss may use the name of the assured in an action to obtain redress from the carrier whose failure of duty caused the loss."

See, also, U. S. v. American Tobacco Co., 166 U. S. 468, 474, 17 Sup. Ct. 619.

In the face of these authorities, it is apparent that the question as to who shall bring the suit is one to be determined between the shippers and the insurance company. It is no concern of the appellant whether the libel is brought in the name of the shippers, or in the name of the insurance company. In either event the right of the claimant in its defense would be identical. If the insurance company became subrogated to the right of the partnership during the lifetime of all the partners, the death of one subsequent to the loss, and its payment by the insurance company, would not prevent it from recovering from the carrier for the damage sustained to the goods. The insurance company had the right at its election to use the name of the surviving partners of the firm in bringing this suit, or to have instituted the suit in its own name. If it were brought for the benefit of the insurance company, it stands, in law, the same as if it were brought in its own name,

and its right to maintain the suit cannot be questioned by the claimant.

There are other minor points discussed by counsel, which we have examined, but do not think necessary to discuss. It is enough to say that they are without merit.

7. It is contended by appellant that no negligence on the part of the ship was proven by appellees; that the presumption of negligence from the goods being wet was overthrown by proof on the part of appellant that the steamer was seaworthy when she sailed, and that there was no negligence of the master or crew on the voyage; that these facts, which are not disputed, cast upon the libelants the burden of proving some specific negligence, which they have failed to do; that the libels, while they allege the execution of the contract, are based, not upon a breach of contract per se, but upon negligence, and negligence only, as the occasion and foundation of the alleged damages. Upon these points the respective proctors have exhibited great and commendable industry in the citation of authorities which it is claimed support their views, and have furnished the court with convincing evidence of their skill, ability, and learning in the arguments which they have elaborately made in their briefs. In the light of their respective contentions, it becomes important to first determine the true nature and character of the libels,—whether they are to be construed to be actions upon torts, as claimed by appellant, or actions upon contracts, as claimed by appellees. The question is important. But, upon a careful examination of all the cases, we are of opinion that it is not difficult of solution. There is no apparent conflict in the authorities cited. The differences which at first blush might seem to exist are, upon close examination, found to be based upon different facts as to the allegations contained in the libels. Some refer to common-law actions, others to proceedings in admiralty; some are cases of collision, and others upon contracts for affreightment. Discretion, judgment, and patient consideration must be brought to bear in order to determine which are applicable, and which are not, to the pleadings and facts in the present case. We have, in the statement of facts, copied the averments in the libels. They need not be repeated. It is essential to bear in mind that proceedings in admiralty are not the same as in the courts of the common law. As was said by Mr. Justice Story in The Adeline, 9 Cranch, 244, 284, "no proceedings can be more unlike than those in the courts of common law and in the admiralty." In actions at common law the pleadings are to be construed strongly against the pleader, and often strictly, without regard to the real substance of the action; but in admiralty the rule is different. All courts of admiralty agree in regarding substance as of more importance than form, in the proceedings which come before it; and therefore any process in admiralty is, in general, if not always, sufficient, which distinctly brings the substance of a case, and the actual parties, before a proper court in such way as to permit the questions of the case to be investigated, its merits ascertained, and justice done. 2 Pars. Adm. 369.

The criticism of appellant is based upon the language in the libel, "that, in consequence of the injury and damage to said merchandise by sea water,   *   *   *   the libelant has sustained damages." And he argues that while the libels, by way of inducement, show a failure

to perform the special contracts, they do not claim any damage as resulting therefrom, and that, by the selection of the libelants, the damages alleged are limited to the alleged negligence of the servants of the Pacific Coast Steamship Company in permitting the sea water to flow in upon the goods, and that such averments show that the action is founded upon a tort, and not upon a contract, and that, if there was no negligence, the libelant cannot recover any damages. We are unable to agree with the views thus expressed. On the other hand, we are of opinion that the proceeding is founded upon the contract of affreightment, and that the claim for damages is based upon the failure of the steamship company to deliver the merchandise in good order and condition, and that the averments in the pleadings as to the negligence are merely illustrative of the manner in which the goods were damaged. It cannot, it seems to us, be legally said that the mere mention of the word "negligence," as used in the pleadings, changes the character of the proceeding from one on a contract to one in tort. If there is an express contract, and the act complained of is a breach of it, the action is clearly founded on a contract. The libelants had the privilege of selecting the form of the proceeding,—whether in tort or upon the contract; and, having elected to rely upon the contract, they are entitled to all the rights and privileges pertaining thereto.

The authorities cited by appellant in the collision cases and cases at common law are not, in our opinion, applicable to this case. The other cases do not sustain his position.

In Legge v. Tucker, 1 Hurl. & N. 500, which is referred to with approbation by the court in Atlantic & P. R. Co. v. Laird, 164 U. S. 393, 398, 17 Sup. Ct. 120, the action was, in form, an action on the case, for the negligence of the livery stable keeper in the care and custody of a horse; and it was held that the foundation of the action was a contract, and that, in whatever way the declaration was formed, it was an action of assumpsit. Pollock, C. B., said:

"Where the foundation of the action is a contract, in whatever way the declaration is framed, it is an action of assumpsit."

Watson, B., said:

"The action is clearly founded on contract. Formerly, in actions against carriers, the custom of the realm was set out in the declaration. Here a contract is stated by way of inducement, and the true question is whether, if that were struck out, any ground of action would remain. Williamson v. Allison, 2 East, 452. There is no duty independently of the contract, and therefore it is an action of assumpsit."

In Baylis v. Lintott, 8 L. R. C. P. 345, the action was against a carriage proprietor for not securely carrying certain luggage belonging to a person who had hired his carriage. The declaration alleged that in consideration that the plaintiff, with her luggage, would become a passenger in such carriage, the defendant promised to carry the plaintiff and her luggage safely, but did not safely carry the plaintiff's luggage, but so carelessly and negligently conducted himself that part of said luggage was lost. The court held that the cause of action set forth in the declaration was "founded on a contract."

In Fleming v. Railway Co., 4 Q. B. Div. 81, 83, the material parts of the statement of claim were (1) that the plaintiffs delivered to the defendants, as common carriers of goods for hire, a parcel of goods of the plaintiffs, to be carried by the defendants from Sheffield to Dundee, for reward to the defendants; (2) that the defendants, as such common carriers as aforesaid, accepted the said parcel of goods, to be by them taken care of, and safely and securely carried and delivered to the plaintiffs at Dundee; (3) that the defendants did not take care of, and safely and securely carry and deliver to the plaintiffs, the said parcel of goods, but, not regarding their duty in that behalf, so carelessly and negligently conducted themselves with respect thereto that the said parcel of goods was and is wholly lost. The court said:

"The question is whether the plaintiffs are entitled to costs in an action in which they have recovered a sum not exceeding £20, and in which they charge the defendants as common carriers. According to Bryant v. Herbert, 3 C. P. Div. 389, we have to determine whether the action 'is founded on contract' or 'on a tort'; and, whether we are to decide this question by looking at the form of the pleadings or at the facts, it is clear that this action is 'founded on contract.' * * * These allegations seem, in effect, to amount to a charge that, in consideration of the payment of hire, the defendants promised to carry safely the plaintiffs' goods; and this would clearly have been, under the old forms of pleading, a declaration in contract."

The law upon this subject is well expressed in Schouler, Bailm. p. 557, as follows:

"Concerning the Form of Action. This, at common law, may be ex delicto or ex contractu. So long as the common-carriage occupation was considered simply as a public duty, its breach was deemed tortious, and the carrier suable in an action on the case founded upon the custom of the realm, but, when contract began to assuage the rigor of public policy, it became established that the carrier should be held liable in assumpsit on his undertaking; and hence the modern usage to lay hold of the advantages of the action ex contractu, while preserving those likewise of that more ancient remedy against carriers, ex delicto, which the practice of earlier centuries commended. Where the transaction and the character of the loss require the plaintiff to show a contract, express or implied, with the carrier, to support his action, contract is the true remedy; otherwise the preferable form of action is tort."

In a proceeding of this character, and under the facts established in this case, the following principles of law are well settled:

(1) That common carriers by water, like common carriers by land, are in the nature of insurers, and are liable for every loss or damage, however occasioned, unless it happens from the act of God or the public enemy, or by the act of the shipper, or from some other cause or accident expressly excepted in the bill of lading. Niagara v. Cordes, 21 How. 7, 22, 26. In Hall v. Railway Co., 13 Wall. 367, 372, the court said:

"When a loss occurs, unless caused by the act of God or of a public enemy, he is always in fault. The law raises against him a conclusive presumption of misconduct or breach of duty in relation to every loss not caused by excepted perils. Even if innocent in fact, he has consented by his contract to be dealt with as if he were not so."

(2) That where merchandise is shipped, and the usual bill of lading given, promising to deliver the same in good order, the dangers of the sea excepted, and they are found to be damaged, the

onus probandi is upon the owner of the vessel to show that the injury was occasioned by one of the excepted causes. Rich v. Lambert, 12 How. 347, 357; Nelson v. Woodruff, 1 Black, 156, 169; The Majestic, 166 U. S. 375, 386, 17 Sup. Ct. 597, and authorities there cited; The Lydian Monarch, 23 Fed. 298; The Mascotte, 2 C. C. A. 399, 51 Fed. 605; The Compta, 4 Sawy. 375, 377, Fed. Cas. No. 3,069; Hunt v. The Cleveland, 6 McLean, 76, Fed. Cas. No. 6,885; Ang. Carr. § 202; Chit. Carr. *142; Lawson, Carr. §§ 245, 247.

(3) That, in every contract for the carriage of goods by sea, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and his undertaking to safely carry the goods cannot be discharged because the want of fitness in the steamer is the result of latent defects. The Caledonia, 43 Fed. 681, 685; Work v. Leathers, 97 U. S. 379; The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823; The Caledonia, 157 U. S. 124, 130, 15 Sup. Ct. 537.

(4) That, although it may be presumed that a vessel is seaworthy when she sails, if soon thereafter a leak is found, without the ship having encountered a peril sufficient to account for it, the presumption is that she was not seaworthy when she sailed. Higgie v. American Lloyds, 14 Fed. 143, 147; The Gulnare, 42 Fed. 861; Work v. Leathers, 97 U. S. 379; The Planter, 2 Woods, 490, Fed. Cas. No. 11,207a; Cort v. Insurance Co., 2 Wash. C. C. 375, Fed. Cas. No. 3,257; Walsh v. Insurance Co., 32 N. Y. 427, 436.

Appellant contends that the stranding of the Queen is the causa proxima of the damage, and was a sea peril, within the meaning of the special contracts relieving the Queen from all liability for damage resulting from "dangers of the sea," and that upon the established facts "that a thoroughly seaworthy vessel, without negligence on the part of her crew, springs a leak 12 hours after she sails, she not having, so far as is shown, encountered anything unusual upon the voyage, what is the presumption relating to the leak? Was it the result of accident? Was it the result of a sea peril? That it must be presumed to have resulted from the one or the other, seems evident." We are of opinion that the stranding of the ship at Port Harford was only incidental in causing the damage. The steamer was run to the beach, not because of high winds or boisterous weather, or any danger of the sea, but from the fact that a leak had been discovered which could not be controlled. The fact, if it be the fact, that the merchandise was not wet with sea water until the steamer stranded at the beach, is wholly immaterial. It was the leak in the steamer that was the cause of the damage, and the real and only question necessary to be discussed is whether that leak was occasioned by a peril of the sea, or came within any of the exceptions mentioned in the shipping receipt, or, if the cause of the leak is not shown, then, upon the presumptions which the law raises as to the burden of proof; and we shall confine our discussion to those points.

The argument on behalf of appellant is based upon the erroneous theory that its obligation to libelants was discharged when it introduced evidence at the trial that the Queen was an absolutely

seaworthy steamer when she sailed, and was properly manned, officered, and equipped on her voyage, and that appellant was not guilty of any negligence in the use of the steamer or the handling of the goods. In order to overcome the prima facie case made by the libelants, so as to relieve itself from all responsibility, the law imposed upon appellant the burden of establishing that the damage to the goods was occasioned by some of the exceptions mentioned in the shipping receipt; and in this respect it has failed to meet the requirements of the law. What are the facts? The libelants simply introduced their shipping receipts as evidence of the apparent good order and condition of the merchandise when delivered to the steamship company, the damaged condition of the goods when returned to San Francisco, and that the goods were then of less value than when shipped. Appellant then introduced evidence which tended to support the averments in its answer as to the absolute seaworthiness of the Queen when she sailed; the competency of her master, officers, and crew; the fact of a leak being discovered about 11 hours after the Queen sailed from San Francisco; that every attempt was made, consistent with prudent navigation and good seamanship, to discover the aperture or place through which the water entered the steamer, and the circumstances of her being compelled to put into Port Harford, and her being there beached, substantially as alleged in claimant's answer. The evidence shows that the leak was on the starboard side of the vessel, and was first discovered by the water tender, who noticed a small amount of water on the floor of the engine room, in a place that should have been dry. It was dropping from a point in the iron bulkhead on the starboard side of the engine room, a few inches above the deck of the alleyway in the between-decks of the vessel, coming from a water-tight compartment on the starboard side. This condition of affairs was immediately reported to the captain, and prompt measures were at once taken to ascertain the precise locality and cause of the leak, and to arrest its progress. But all of the efforts of the officers and crew in this direction proved ineffectual; and the captain then, in the exercise of a wise discretion, as alleged in the answer, and shown by his testimony, ran the steamer upon the beach at Port Harford. The evidence is as dumb as an oyster as to the cause of the leak. There is no evidence that the Queen, after she sailed from the port of San Francisco, met with any accident or injury, or tempestuous winds or boisterous weather, which would have caused the leak. The captain, it is true, stated that they had some boisterous weather, but, upon his cross-examination, admitted that it was only the ordinary weather usually met with, and to be expected, at that season of the year. There was no evidence tending to show that the leak could be rationally attributed to any accident or injury produced by the state of the weather then prevailing. From this brief, but substantial, review of the testimony, it is apparent that the real and efficient cause of the leak is not disclosed by the evidence. It does not affirmatively appear that the cause of the leak was not within the knowledge of the claimant. It is true that in appel-

lant's brief it is said, "The cause of the aperture has not been explained, nor does it appear that it was within the power of any one to explain it." Again appellant says, "Claimant showed the fact of the leak, and that it did not know—could not know—what cause it was that had produced it." We have been unable to find any testimony in the record that supports these statements. But, on the contrary, the record shows that pending the examination of Capt. Alexander, of the Queen, as a witness, the court, of its own motion, put to him several questions,—among others, the following:

"Q. I will ask you another question, to which there may be an objection made by counsel, and you need not answer it until I determine the objection. After the Queen of the Pacific was raised at Port Harford, did you discover the cause of the leak? Mr. Towle: We object to that. The Court: What is the ground of your objection? Mr. Towle: The objection is that it is not a part of our case, and is not the theory on which we are trying it,—as to what may have been discovered after the vessel had been on the rocks. (After argument.) The Court: I appreciate the fact that you are trying the case very carefully, and on a very narrow margin. I think, for the time being, I will sustain Mr. Towle's objection to the question put by the court. Mr. Towle: I would like your honor to withdraw the question. Mr. Andros: I would prefer that the objection be sustained. The Court: I do not want anything that the court does to change the theory of the case. I will withdraw the question for the present, and will see what may come hereafter. I do not know what I may do hereafter."

This action upon the part of the claimant is significant,—especially in view of the fact that it appears from the evidence that after the Queen was beached at Port Harford, and while she was partially submerged, a diver was sent down to examine her bottom and ascertain what was wrong with the steamer. He stopped the leak, all the bulkhead doors were secured from the inside, a cofferdam was built around the forward hatch, the water was pumped out, and the steamer floated. Forty-eight hours thereafter she returned to San Francisco, without any leak occurring on the return voyage; and upon a thorough examination at the Union Iron Works, on the dry dock, she was found to be in a perfectly seaworthy condition. Considering these facts, not alone upon probabilities and conjecture, but in the light of reason, and of the objections that were made to the question asked by the court, is it not fair to presume that the claimant had knowledge of the real cause of the leak, and that its failure to show what the cause was is a strong circumstance tending to show that, if the truth had been disclosed, it would not have relieved the claimant upon any of the grounds of exemption from liability in the shipping receipts or bills of lading?

In Railway Co. v. Ellis, 4 C. C. A. 454, 54 Fed. 481, 483, the court said:

"Now, it is a well-settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support the inferences against him; and the jury is justified in acting upon that conclusion. 'It is certainly a maxim,' said Lord Mansfield, 'that all evidence is to be weighed according to the proof which it was in the power of one side

to have produced, and in the power of the other side to have contradicted.' Blatch v. Archer, Cowp. 63, 65. It is said by Mr. Starkie, in his work on Evidence (volume 1, p. 54): 'The conduct of the party in omitting to produce that evidence in elucidation of the subject-matter in dispute which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice.' "

We are of opinion that the court, notwithstanding the objection of Mr. Towle, would have been justified in requiring the witness to answer the question, even if it were not in precise harmony with the theory upon which the parties were proceeding in the case. Why not? If it were within the power of the court to ascertain the truth, why should it be withheld or suppressed because the proctors desired to burden the court with the legal presumptions arising from the failure to show a fact which, if shown, would make the solution of the question as to how the case should be decided easy and plain? The court ought not to have been compelled to decide the case upon the presumptions of law until it was affirmatively shown that the claimant could not, after diligent search, introduce any evidence as to what caused the leak. Why should the court be required to indulge in presumptions, of its own motion, as to the cause of the leak, and then be criticised for so doing, when the appellant carefully, cautiously, and designedly refrained from shedding any light thereon, or offering any evidence in regard thereto; assigning as the reason therefor, that such facts would be inconsistent with the theory upon which the case was being tried? If appellant had introduced any testimony that it had tried to ascertain the cause of the leak, and had been unable so to do, that would, perhaps, have introduced another theory; but if Capt. Alexander had been allowed or compelled to answer the question asked by the court, and the examination continued on this new theory, the presumptions are that the truth as to the cause of the leak would have been discovered, and the case would have then been decided upon the facts, instead of presumptions.

In The Compta, 4 Sawy. 375, Fed. Cas. No. 3,069, which is cited and relied upon by both parties, and which, in several respects, bears a close analogy to the case in hand, the court said:

"This action is brought to recover damages for injuries to goods shipped on board the above vessel, and consigned to libelants under various bills of lading, which are appended to the bill. At the hearing, the shipment of the goods, and their delivery in a damaged condition, were admitted. It was also admitted that the damage was by sea water. The burden of proof was thus cast upon the carrier to show that the damage was occasioned by one of those causes from the effects of which he is exempted, from the terms of the bill of lading, or by the general rules of law."

After stating that the defense set up in the answer was perils of the sea, and that the contention of the defendant was that the ship encountered such violent gales and heavy seas "as to strain and damage her, thereby causing her decks to leak and admit water to the cargo," and the facts in relation thereto, the court further said:

"It may, I think, reasonably be concluded that the weather experienced by the vessel was such as might, possibly, have produced, on a stanch and sea-

worthy ship, the effects attributed to it by the claimants, but that it was not of such unusual and extreme severity as to justify the assumption, without further evidence, that it caused the leaks which occasioned the damage. The carrier, to make good his defense, is bound to show that the damage arose from a sea peril. It is not enough for him to show that it might have arisen from that cause. He must prove that it did. This proof can be afforded either by showing a sea peril of such a character that injury to the vessel, however stanch and seaworthy, would be its natural and necessary consequence, or by the direct testimony of those who observed its effect upon the ship, or by proving her condition on her arrival; or he may exclude every other hypothesis of causation, by satisfactory proof that she was tight, stanch, and seaworthy at the commencement of the voyage."

The broad statement is clearly made that it is the duty of the owner, in order to relieve himself, "to show that the damage arose from a sea peril." It necessarily follows that, if such facts are known to him, he must prove them. "It is not enough for him to show that it might have arisen from that cause. He must prove that it did." If the facts are unknown to him then the other methods of proof suggested by Judge Hoffman may be resorted to, —their sufficiency, of course, to be determined by the court. Common sense and sound reason appeal strongly to the conscience of the court, against the adoption of any rule that would allow the claimant to withhold the facts within his knowledge, and rely solely on the theory of presumptions.

In The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, the vessel was bound from Weymouth, Mass., to Savannah, Ga., and her cargo was damaged by reason of the loss of the cap covering the bilge-pump hole; and it was alleged that this pump had not been properly screwed down, but negligently and improperly fastened, and left insecure, by those in charge of the steamer. The defense was that it was displaced by a peril of the sea. The district court entered a decree in favor of the libelant, which was reversed by the circuit court. The supreme court reversed the decision of the circuit court, and affirmed that of the district court. It appeared in that case that almost immediately after the commencement of the voyage the steamer encountered a storm of unprecedented violence, from the effects of which she took in 18 inches of water, which came in contact with the cargo, and soaked it to some extent. The court said:

"Assuming, as we must, that the damages awarded by the district court resulted from the loss of the cap and plate covering the bilge-pump hole, the question to be determined is whether that loss was occasioned by a peril of the sea, or by the condition of that covering as it was when the vessel entered upon her voyage. If, through some defect or weakness, the plate and cap, and the screws which secured it, came off, or if the cap and plate were so made or so fastened as to be liable to be knocked off by any ordinary blows from objects washed by the sea across the decks, then the vessel was not seaworthy in that respect, and the loss could not be held to come within the exception of perils of the sea, although the vessel encountered adverse winds and heavy weather. * * * The obligation rested on the owners to make such inspection as would ascertain that the cap and plates were secure. Their warranty that the vessel was seaworthy in fact did not depend on their knowledge or ignorance, their care or diligence."

Upon all the evidence contained in the record, we are of opinion that the court did not err in its conclusion that the burden of

proof rested upon the claimant to show that the leak, which was the direct cause which led to the damage of the goods by sea water, occurred by the danger of the sea, and that in the absence of any such proof the presumption of the law is that the damage was occasioned either from the unseaworthiness of the steamer, or from the carelessness or negligence of the officers and crew on board. In either event the claimant and the steamer would be liable. The decree of the district court is affirmed, with costs.