## CARLOS LE BRUN, Plff.,

*v.*

## PEDRO ROMERO ET AL., Dfts.

------

San Juan, Equity, No. 416.

1. The proceeds of a promissory note payable to order and indorsed before maturity, but not in good faith by either the payee or indorser, will, in a suit to settle the right thereto, be held to belong to the payee, defendant in judgment, and will be applied to the payment of a prior

judgment against him in favor of another party to the interpleader pro-
   ceedings.
2. Presumptions will be indulged against a person having exclusive knowl-
edge of facts, who fails to produce proof thereon.

Opinion filed November 25, 1907.

---

*Messrs. Sweet, Rossy, & Campillo,* attorneys for plaintiff.

*Mr. N. B. K. Pettingill,* attorney for defendant Adolfo
Sixto.

*Mr. Henry F. Hord,* attorney for defendant Pedro Romero.

RODEY, Judge, delivered the following opinion:

This is another phase—and we hope it is the last—of the
now somewhat celebrated Sixto-Sarria controversy in this court,
with which we have already had so much trouble. The com-
plainant seeks to force respondents Romero, Sixto, and Sarria
to litigate their respective rights to the whole or most of a fund
of $16,500 that has been on deposit in the registry of this court
for nearly two years last past.

In September, 1902, the respondent Adolfo Sixto brought a
suit at law in this court (No. 158, docket) against the respond-
ent Laureano Sarria, to recover his share of some 16,000
pesos Porto Rican currency, alleged to be due from Sarria to the
estate of said plaintiff's father, and to said plaintiff himself as
an heir thereto. Much litigation about the matter had thereto-
fore taken place between said parties and others in the insular
courts during several years previous to American occupation of

Le Brun v. Romero.

Porto Rico. The judgment was for the defendant in the suit referred to, from which Sixto promptly took his appeal to the Supreme Court of the United States, where the cause was reversed in 196 U. S. 175, 49 L. ed. 436, 25 Sup. Ct. Rep. 186. The opinion of Mr. Justice Day gives a succinct and rather complete history of the litigation between these particular parties and others up to that time, and settled several important legal propositions respecting their rights.

When the cause was remanded to this court, another·trial was had on April 17, 1905, which, under the mandate, resulted in a judgment in favor of Sixto for the sum of $13,475.50, including costs. Sixto thereupon immediately began supplementary proceedings against Sarria with a view to collecting the money thus found due him, and, on April 24th following, cited into court the present complainant, one Carlos Le Brun, of Vieques, Porto Rico. From him it was ascertained that he was indebted to the judgment debtor, Sarria, on a note, dated about two months previous (March 1, 1905) in the sum of $24,000 and interest, which would be due the 31st of October following in that same year. A previous incumbent of this bench then at once issued an order against Le Brun commanding him to hold enough of the money due on that note to satisfy the judgment, and commanded him that when the note was due, he should pay enough of the money into court to answer the same purpose.

Shortly after receiving the note from Le Brun here in Porto Rico, on March 1, 1905, Sarria left for Spain, and was absent in that country at the time the final judgment on the mandate from the Supreme Court was rendered against him on the 17th of April of that year. In a little over·a month after Le Brun was garnisheed or the money impounded in his hands, as afore-

said, Sarria returned to Porto Rico, and was promptly brought
in to answer questions in the supplementary proceedings against
himself.   On the hearing, the court, evidently believing from
the evidence that he was in possession of a large amount of
money, and probably of money other than that represented by
the note referred to, ordered him to at once pay the judgment
about which the supplementary proceedings were pending.   It
appears from an examination of the record, and from a direct
statement to that effect, left in the files by the then judge, that
the previous order to Le Brun to pay this money into court was
considered merely as interlocutory, and was not considered or
intended as a satisfaction of the judgment, although much con-
troversy was had on that subject before us thereafter.   Sarria,
when testifying in those supplementary proceedings, disclaimed
having any money at all, much less money to pay this judgment,
but the court, on the evidence, obviously thinking otherwise,
finally ordered him committed as for a contempt for his failure
to pay on its order, although he was not actually confined in jail,
through some understanding between the court and counsel, or
counsel and the marshal.   Sarria thereupon made an applica-
tion for a writ of habeas corpus, in and about which numerous
proceedings were thereafter had in efforts for his release, or for
a discharge of the order against him.

This was the situation when the present incumbent of this
bench qualified in June, 1906, and several hearings took place
before us on new phases of this application for a writ of habeas
corpus during the ensuing two or three months.   Furthermore,
a good deal of controversy was had as to the right of the court
to the possession of this money so paid into the registry by

Le Brun v. Romero.

Le Brun, and as to the right of the court to so issue an order of imprisonment of Sarria on the evidence.

When Sarria testified in the supplementary proceedings, he claimed that he had indorsed the note in question on the 7th of April, 1905, a little over a month after he received it, to one Pedro Romero, of Orense, Spain, for full value, less some ordinary commercial discount, and that Romero was then, and had been since such date, the owner thereof, and was an innocent purchaser for value without notice in the premises.

Some time before the note actually became due, it was sent from Spain to a local bank in Porto Rico, ostensibly by Romero or his agent, for collection, and on the day that it was due it was presented to Le Brun for payment. He tendered the receipt of the clerk of this court for the deposit he had made under its order, into the registry, and the balance of the amount of the note and interest in cash, to the bank, but the latter refused to receive the same as full payment in the premises. Thereupon, the note was duly protested for nonpayment, and shortly thereafter Romero brought a suit against Le Brun (No. 339, law docket [2 Porto Rico Fed. Rep. 168]) through Henry F. Hord, Esq., as his attorney, who was and is also the attorney defending Sarria in the supplementary, contempt, and other proceedings aforesaid. It is stated, however, that Mr. Hord's employment in this latter suit was casual, and had no connection with the fact of his employment by Sarria in the other litigation.

Evidently not knowing what else to do, Le Brun thereupon paid said balance and interest so due on the note, which he had thus tendered to the bank, into this court, and brought a suit (No. 355, law docket) to restrain Romero from prosecuting his said suit for the collection of the note until the matter should

be settled in some way; but afterwards Le Brun dismissed this latter suit, and, by leave of court, filed this interpleader in the present case against all the parties, praying that they be forced to litigate their respective rights to said money, or to so much thereof as might be necessary to satisfy the said Sixto judgment, and that the question of the ownership of the money be settled and determined by a proper order, judgment, or decree, and he be relieved of the danger of having to pay the same twice. Substitute service was had on Romero through his counsel, and Sixto's counsel appeared voluntarily. Issue was therefore duly joined. The court thereupon permitted counsel for Romero, Henry F. Hord, Esq., to withdraw the surplus of $8,780 from the registry, the same being indorsed upon the note as a payment thereon, thus leaving $16,500 as first herein mentioned, in the registry to satisfy all possible recovery of Sixto in the premises. The prosecution of the other suit by Romero for the collection of the note was thereupon ordered to remain in abeyance until the determination of this controversy as to the ownership of this money.

It will thus be seen that the decision here will result in either the dismissal of the other two proceedings and the satisfaction of the judgment in the main case, or in their being permitted to proceed, and the money in the registry returned to Le Brun for the payment of his note to Romero.

The court of course takes a judicial notice of its own records and has full knowledge of all the evidence in the supplementary proceedings given by Le Brun, Sarria, the local banker, and others, and of the exhibits in the same, and is, of course, bound by the findings of the Supreme Court of the United States as to Sixto and Sarria. But aside from that, all necessary por-

Le Brun v. Romero.

tions of the evidence and exhibits in the supplementary proceedings were introduced in this particular controversy and are now before us. However, in this particular interpleading controversy, a considerable amount of evidence was taken orally, and exhibits consisting of the correspondence between Romero and the bank, as well as the original note, were filed. The stenographer's notes of the evidence, all of which were taken in the presence of the court itself, have been transcribed, and we have recently reread the same before entering on the expression of these views. Counsel were heard at length orally on the respective sides and have each filed written arguments and briefs for our guidance. The matter is therefore before us in all its aspects upon these proofs. The controversy really narrows down to two or three points:

(1) If the note in question is an ordinary negotiable instrument to which the law merchant fully applies, and if Romero is an innocent purchaser thereof, without notice, and for value, before it became due, then, in law and in fact, he is the owner thereof, and the fund impounded in court should be applied to the payment of his note.

(2) If, on the other hand, as is strenuously contended, the note in question is not one to which, under the code of commerce of Porto Rico, the law merchant applies, not having arisen out of a "commercial transaction," but is a mere chose in action, not negotiable, but, at most, merely assignable, but subject to all the equities of the maker against the payee, and also subject to the claim of attaching or garnisheeing creditors of the payee, before notice of the transfer to the maker, then, as the money was garnisheed in Le Brun's hands before such notice, it is contended it should be applied to the payment of

the Sixto judgment, under the rule laid down in Golsan v. Powell, 32 La. Ann. 521.

(3) Of course, the additional position is taken that, even though the note should be held to be fully negotiable, if, as matter of fact, the court shall find and hold on the evidence as it is urged to do, that the note never was, in truth or in good faith, assigned at all, and that the alleged transfer thereof to Romero is only colorable, and is in fact collusive, that then Sarria should be held to be still the owner thereof, his disclaimer and evidence to the contrary notwithstanding; and the fund should be applied to the payment of Sixto's judgment and costs, as well as to the payment of reasonable costs, expenses, and attorney's fee to Le Brun, for the unnecessary trouble he has been put to, brought about by such collusive action of Sarria and Romero in the former's efforts to avoid the payment of the judgment.

It may be well not to forget, as we proceed, that Sarria, the judgment debtor in these supplementary proceedings, and the payee of the note, vehemently disclaims any interest in the fund, on the ground that he has sold it to Romero for full value, and therefore, in a measure, this present controversy is between Sixto and Romero.

We must not forget, either, that while it looks like a hardship that any man should have to pay a debt twice, as it is contended Sarria will have to do if he pays this debt, yet, as was properly pointed out by Mr. Justice Day of the Supreme Court of the United States in the Sixto v. Sarria Case (196 U. S. 191), the money was paid by Sarria to one Antonio Roig with his eyes open, in a proceeding to which Sixto was not a party, and at a time when Sarria had full notice of his rights in the premises.

The language used by the court is: "This order [the order upon which Sarria paid it] could have no effect on the rights of the plaintiff in error [Sixto], nor can it protect Sarria, who acted in the face of knowledge of the decision of the higher court, instead of appearing in that court, at the suit of Sixto, and having the rights of Roig and the contesting heirs determined. We conclude that the plaintiff in error [Sixto] had the right to recover his share of the third and fourth instalments notwithstanding the alleged transfers and payments to Roig and the alleged decree of the audiencia in the proceeding to which Sixto was not a party."

A fair translation of the note in question is as follows:

For $24,000.00.
   Pedro Romero
    034,065
    Orense.

---

I owe and shall pay upon demand or order of Don Laureano Sarria y Gonzalez, on the thirty-first day of October, nineteen hundred and five, the sum of twenty-four thousand pesos, American gold, and shall likewise pay to said Mr. Sarria, or his order, every month, a sum equal to eight per centum per annum on the aforesaid amount of twenty-four thousand dollars, as interests agreed upon. At the same time I shall now state that the said sum has been given to me by Mr. Sarria in current coin to my entire satisfaction, to be used in meeting the expenses of the plantation known as Santa María, of which I am the manager in this island, and, as such, I bind all my present and

future property to the compliance of everything herein stated, signing it at Vieques this first day of March, 1905.

(Signed) Ch. Le Brun.

Let it be paid upon order of D. Pedro Romero, for value received.

Orense, April 7, 1905.

(Signed) L. Sarria.

(Rubber Stamp)

Laureano Sarria

Orense.

Let it be paid upon order of Messrs. J. T. Silva & Co., value on account.   Orense, Sept. 13, 1905.

(Signed) Pedro Romero.

p. p. Basilio Dominguez.


It is nearly always somewhat of a surprise to a lawyer familiar only with the rules of the law merchant that govern commercial paper in England and in practically all of the states of the United States, to be brought to a realization of the fact that, in civil-law countries, the law merchant does not apply to all formal promissory notes.   "The general rule of the common law [of course] is that, except by a sale in market overt, no one can give a better title to personal property than he has himself.   The exemption from this principle, of securities, transferable by delivery, was established at an early period. It is founded upon principles of commercial policy, and is now as firmly fixed as the rule to which it is an exception."   This is the language of Mr. Justice Swayne of the Supreme Court of the United States, in the leading case in America upon this important subject, of Murray v. Lardner, 2 Wall. 118, 17 L. ed. 858. It but calls attention to the comparatively recent period of

time (1864) when this very important principle of commercial law was settled for good by the highest court in the nation, and a reading of the cause referred to, where a complete review of the subject is made, and all the ancient cases that led up to the establishment of the rule in England and America are fully and intelligently discussed, is very interesting indeed.

In Spain and Porto Rico, however, such transactions have been governed by the Spanish code of commerce; and since American occupation in this island, if the local code of commerce is in force,—which we are not now deciding,— then it would seem, at least under this code, as if the law merchant, as we understand it, applies only to promissory notes payable to order, that arise out of commercial transactions of merchants; in other words, that under §§ 1, 2, and 532 of the code of commerce, the parties making the instrument must probably be merchants or shopkeepers, and the subject-matter involved must be a commercial transaction as defined by the code.

Counsel on the respective sides of this controversy have cited us to many cases from the Supreme Court of Spain, some of them decided under the old code of 1829 and others under the modern code of 1885, which latter code resembles the one said to be now in force in Porto Rico, and which cases are intended by counsel citing them to convince us that the note in question is or is not the result of a commercial transaction, and hence is or is not negotiable in the American or law merchant sense. To our mind,—and we have taken some pains to read these cases in the original Spanish text,—they are, on the whole, rather conflicting. The cases referred to, and which we insert for the convenience of future searchers, are: Barbon y Cia. v. Marques de Villalda y otro, March 24, 1871, 23 Id. 626; Boom v. Terry, January 29, 1859, 4 Jurisprudencia Civil, 146; Orthenbach &

Le Brun v. Romero.

Co. v. Sagas, March 28, 1860, 5 Id. 344; Crédito Castellano v. Enriquez, December 24, 1867, 16 Id. 659; Sociedad Banco Ibérico v. Taranco, January 22, 1889, 65 Id. 90; Escribano v. Pastora et al. April 10, 1894, 75 Id. 483; Gamero v. Cajigas, November 24, 1894, 76 Id. 416; Banco Ibérico v. Zozaya, November 25, 1898, 85 Id. 403; and March v. Aguilar, January 25, 1905, 100 Id. 167.

Of course, we are well aware that "the courts of the United States are not controlled by the decisions of state courts on questions of general commercial law," as was held in Swift v. Tyson, 16 Pet. 1, 10 L. ed. 865; Brooklyn City & N. R. Co. v. National Bank, 102 U. S. 14, 26 L. ed. 61, and other cases. In fact, it has occurred to us that perhaps even this court would not be bound by even the local code of commerce if it is in force, as claimed, in so far as it may attempt to continue the civil-law rule as to the law merchant. It may be—but we are not, of course, asserting it—that, Porto Rico not being a sovereign state, like Louisiana, the civil-law rule as to the law merchant would be held to be contrary to the organic act on general principles.

It would, however, seem to be the rule that, in the absence of evidence to the contrary in any particular case, a promissory note made payable to order will, even by the Spanish courts, be presumed to be the result of a commercial transaction, and hence, we presume, be considered negotiable. This position was taken by the supreme court of Porto Rico in the recent case of Hernadez v. Muñoz, decided in January, 1906, 3 Castro pamph. 201, p. 6 and is based on a decision of the Supreme Court of Spain of January 25, 1898, in the case of Ayoldi, v. Barrio de España, 83 Juris. Civil, p. 160. However, in this particular case there is abundant evidence that neither

Le Brun v. Romero.

Le Brun nor Sarria was at the time, or is now, a merchant, at least, in the sense of the code, and there is abundant evidence aside from the language of the note itself, as above, that the transaction grew out of an accumulated account, and most of it out of a direct loan of money.

But, in the view we take of this case, it is unnecessary for us to decide whether or not the note in question is one made and circulated by merchants, or whether it did or did not arise out of a commercial transaction, within the meaning of the code, because we are convinced, as matter of fact, on the evidence, and so hold, that the note never was in good faith transferred by Sarria to Romero, and that it and the debt it represented were, and still are, in truth and in fact, the property of Sarria, and that the whole transaction regarding the sale or discount of the note to Romero was and is, in fact, simulated and collusive. We have no hesitation in making this finding on the evidence; and so that it can be seen how well founded the position is, we here review some of the evidence, facts, and circumstances in the cause that justify our finding and belief in that regard; but a full reading of it is necessary to a real understanding of our reasons for the finding. We may state, before proceeding, that we fully realize, as was in effect held in Goodman v. Simonds, 20 How. 343, 15 L. ed. 934, and Kneeland v. Lawrence Bros., 140 U. S. 209, 35 L. ed. 492, 11 Sup. Ct. Rep. 786, and many other cases, that a bona fide purchaser of negotiable commercial paper for value, without notice, before it is due, takes it free from all equities that might have been set up against the original holder, and, further, that the burden of proof is on him who assails the bona fides of such purchase.

At the outset of the discussion of this branch of the case, it is proper to state that this is a suit in equity as to the owner-

ship of this money; and perhaps, for that reason, the issues are not as strictly subject to the rules governing the admission of evidence as would be the case were it a plain suit at law by Romero against Le Brun on the note. Romero simply answers the bill of interpleader, and claims to be an innocent purchaser for value, without notice, before the note was due, and even this he does only by his attorney, and rests at that point on his legal right to recover on his presumption of ownership. He does not come here in person to prosecute or defend the suit, and does not even send his deposition, or volunteer any information of any sort, kind, or character to the court. In fact, he has little or no satisfactory evidence in the cause save the indorsed note and Sarria's word to support it. Counsel for Sixto, who necessarily labors under difficulties, endeavored to take Romero's deposition through letters rogatory, but Romero, through his counsel, filed objections and a protest to the issuance of such letters, but did agree to stipulate that Romero's deposition might be taken, but otherwise did not, in any manner, offer any proof as to the bona fide of his purchase of the note, apparently wholly resting, as stated, upon the presumption of law in his favor. The letters rogatory were transmitted from this court to the judge of the court of first instance at Orense, Spain, who returned them with a polite note, stating that such a commission could only be executed when it came through proper international diplomatic channels. This was probably proper action on the part of the Spanish court, but it did not prevent Mr. Romero, who lived in Orense, and who presumably, and, of course, in fact well knew of the issuance of this commission through his counsel, from testifying, or facilitating the court in getting information as to the bona fides of the transfer of this note.

We have several times called attention to the holding of the

Le Brun v. Romero.

Supreme Court of the United States in 1896, in Kirby v. Tallmadge, 160 U. S. 379, 40 L. ed. 463, 16 Sup. Ct. Rep. 349, to the effect that when one party to an action has in his exclusive possession knowledge of facts which would tend, if disclosed, to throw light upon the transaction which formed the subject of controversy, his failure to offer them in evidence may afford presumptions against him.

We do not hesitate to say that, from beginning to end of this interpleading controversy, Mr. Romero has not only taken no proper interest in the collection of his money, and this is all the more astonishing when it is considered that it is such a large amount, but, to the contrary, has studiously, as it appears to us, refrained from so doing, and avoided giving the court information which was easily in his power to give, and of the necessity for which he had ample notice. We can only account for this silence on the theory that he is not the owner of this large amount of money, and hence takes no interest in what becomes of it. The reasonableness of men's actions cannot but have weight with courts and juries. It is not reasonable to believe that Romero would virtually abandon this large amount of money here if it was in truth and in fact his. Of course, his counsel is doing his best in the case, and filed an uncommonly able brief in his behalf, but we are speaking of Romero himself.

In the case of Gulf, C. & S. F. R. Co. v. Ellis, 4 C. C. A. 454, 10 U. S. App. 640, 54 Fed. 481, it was held that "it is a well-settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if

produced, instead of rebutting, would support the inferences against him; and the jury is justified in acting upon that conclusion." This case was quoted with approval in the case of Pacific Coast S. S. Co. v. Bancroft-Whitney Co. 36 C. C. A. 135, 94 Fed. 194.

We are well aware of the rule that a court may not arbitrarily or capriciously refuse to consider unimpeached and credible evidence, as well as fundamental propositions of law; but, on the other hand, a court is not bound to be satisfied by the testimony of a single witness, and, of course, need not be satisfied with a mere presumption of law, where it is apparent to the court that the side claiming the benefit of this evidence or this presumption has it in its power to produce satisfactory evidence in the case, and fails to do so. This was held to be the true rule in United States v. Lee Huen, in the Northern district of New York in 1902, 118 Fed. 442.

The Supreme Court of the United States held that uncontradicted evidence of interested witnesses to an improbable fact does not require judgment to be rendered accordingly. Quock Ting v. United States, 140 U. S. 417, 35 L. ed. 501, 11 Sup. Ct. Rep. 733, 851.

It was held in the case of National Car-Brake Shoe Co. v. Terre Haute Car & Mfg. Co. 19 Fed. 514, that "if a party shows an unwillingness to let the truth out, and keeps back facts and the means of getting at facts in his power, then the jury is warranted in drawing the strongest possible inferences against him, which may be drawn from the evidence actually given in favor of the other party. But if he comes forward with his books, furnishes all the evidence in his power, and is fairly candid in the matter, no inferences should be drawn against him, except such as are fairly drawn from the evidence adduced."

Le Brun v. Romero.

It is true that Sixto upon whom the burden rests to prove the mala fides of this transaction, has not made out a very positive case, but it is a case where the court can appreciate the difficulties he is laboring under. He showed the making of the note, that it was due from Le Brun, and by Sarria himself showed the circumstances surrounding the carrying of it to Spain, and its alleged transfer, and the improbability of the good faith of the proceeding.

We have read and reread the portion of the evidence taken in the supplementary proceedings, that is before us, and the evidence taken by ourselves on this issue, which is intended to show that this note was transferred in good faith, as stated, to Romero by Sarria, and we are utterly unable to believe it. As is well said by counsel for Sixto in his brief,—we would not believe it as a man in a business transaction, and why should we be asked to believe it as a judge on the bench? Nothing but a sort of judicial cowardice or a slavish submission to the sacredness of the presumptions favoring negotiable instruments could induce us to find for Romero under all the circumstances of this case. In our judgment, he is aiding and abetting Sarria to avoid the payment of at least a legal debt.

Sarria left Porto Rico in 1903 with his family, having retired from business, and evidently departed for good for Spain. He had been in business for many years in Vieques. There were large sums of money due him by his neighbors in the island of Vieques when he left. He took quite a large amount of money with him when he went to Spain with his family, and claims that he did considerable traveling on the continent during the following year. He returned to Porto Rico in the fall of 1905, and he says, "Just to get rid of the severe winter in Spain," and felt in such easy circumstances, as is apparent from

III. Porto Rico—16.

all of his evidence, that instead of carrying back to Spain a large amount of money represented by the note in question and by cash, which he could have done, as he could have easily discounted the note here in Porto Rico at the time, where Le Brun was known, he carried the said note with him to Spain, and more than $10,000 additional in cash. In fact, most of the note he received from Le Brun was in consideration of cash then loaned out at interest, apparently as an investment, to Le Brun, a large part of which he had just collected from one Benitez, or which was transferred in some way between the parties.

The evidence further shows that Sarria got this note on the 1st of March, 1905, and that he must have left Porto Rico about the middle of that month for Spain, because he arrived there on April 2d. Le Brun was called into court in these supplementary proceedings on April 24th, and, when he found the money impounded in his hands, immediately wrote to Sarria in Spain and may have cabled him to that effect. It did not develop that Sarria had transferred this note to Romero in Orense, Spain, on April 7th, until after Sarria returned to Porto Rico in June following and was called in to testify in the controversy. Le Brun shows that he did not believe Sarria intended to transfer the note, or had any intention or need to transfer it, and, according to his evidence, probably expected to renew it for an additional term when it became due. Sarria gave on the stand a long, detailed account of the illness of his family and the defalcation of his son, who, he said, is an officer in the Spanish army, as accounting for, and the using up of, the large amount of money he had brought with him to Spain, both on the former and on this last trip, including this note, and produces a little memorandum which he says the banker gave him when he sold him this and another smaller note in April, 1905, at

Le Brun v. Romero.

Orense. Although Sarria had ample time to do it, he brought with him no memoranda showing the large expenses he claimed he was put to in Spain, which reduced him to pauperism, if he tells the truth, and he does not, when pressed on cross-examination, at all satisfactorily account for his inability to show where he spent all this money. And, while this should not militate against Romero, yet, when this fact is coupled with Romero's silence here and tacit refusal to swear that the transaction is bona fide, it renders the whole story improbable and strengthens our belief that this whole alleged transfer of the note is but a conspiracy to prevent Sixto from collecting his debt, and that Romero is in fact unwilling to swear to its truth. As stated, after making a careful analysis of it, we are utterly unable to believe Mr. Sarria's story, but, on the contrary, we think that he never did in fact sell this note in good faith to Romero, and that, instead, he entered into a collusive agreement with Romero —and probably did it after Le Brun was garnisheed—to indorse the note to him, either without value at all or for little or no value, with the express intention of avoiding payment of Sixto's claim, because the evidence shows Sarria knew an appeal had been taken to the Supreme Court of the United States from the decision in this court, and he no doubt heard of the reversal of it before he left Porto Rico in March, 1905, as the reversal took place in January of that year.

A reading of the evidence will convince anybody that it is so improbable on its face, under all the circumstances of the case, as to be unworthy of belief. Here is a case where a private banker at Orense, Spain, discounts a $24,000-note for a man from Porto Rico, against a man in Porto Rico, and then, when the fund is impounded here, this purchaser rests upon the legal presumption in his favor, and sends not a word of testi-

mony in support of his ownership to the court, although months elapse within which he could and had ample opportunity to do it, and apparently takes no interest whatever in the matter, and leaves no one to look after the matter but his counsel and the person who sold him the note, when, according to Sarria's own evidence, he himself is a pauper, and has no money with which to make that note good to Romero in Orense.

We do not hesitate to confess, as we have often said during the many proceedings involved in this controversy, that if we had been on the bench at the time Le Brun was summoned into court, we do not think we would have permitted process of garnishment to issue against him, because he distinctly stated that he believed his note that was outstanding was negotiable; but, as the money was impounded and brought into court, and as the parties appeared before us and raised this issue, our duty requires us to ascertain from the evidence, if we can, the true ownership of the money. We feel that the issue thus raised, considering all the controversy that has taken place between Sixto and Sarria through many years, and the showing made by Sixto in this particular proceeding as to the circumstances that surrounded the alleged transfer of the note in question to Romero, does put the transfer in doubt, and does require from Romero an explanation and some proof more than his mere formal statement, unsworn, in his answer through his attorney, and Sarria's mere indorsement of the note, as to the bona fides of the transfer to him.

A decree will therefore be prepared and entered, holding this money to be the property of Sarria, and not the property of Romero, and providing for the application of sufficient of the same to satisfy Sixto's judgment, interest, and costs, and all the costs of this interpleading proceeding, and for the payment of a fee

of $100 to counsel for Carlos Le Brun, and for the payment of any balance of the $16,500 that may still remain over, to Sarria or Romero or the latter's counsel, whichever shall choose to receipt for it. And a proper order or decree will also be prepared and entered, compelling the surrender of the note to the clerk of this court for cancellation as paid, and forever enjoining the collection of it from Le Brun, or the prosecution of Romero's suit in that behalf, and complete satisfaction in the main suit between Sixto and Sarria; and it is so ordered, all so as to carry out the full intent of this opinion.