STOCKTON MILLING CO. et al. v. CALIFORNIA NAVIGATION & IM-
PROVEMENT CO.

(District Court, N. D. California. November 20, 1908.)

1. SHIPPING (§ 124*)—INJURY TO CARGO—LIABILITY OF VESSEL.
    Respondent contracted to transport a barge load of flour for libelants,
    and to load the same, but at libelants' request employed a certain com-
    pany to do the loading. When partly loaded, and while lying unattended
    at night, the barge grounded at one end at low tide, by reason of which
    her seams opened and she sank, injuring a part of the cargo. *Held*, that
    the loss was through the negligence of respondent or of its agent, the
    loading company, for which it was responsible.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 458; Dec. Dig. §
    124.*]

2. SHIPPING (§ 141*)—CONTRACT OF AFFREIGHTMENT—LIMITATION OF LIABILITY.
    A provision of a contract for the carriage of a cargo of flour on a barge
    by which the shipper assumed the risks of carriage did not relieve the
    barge owner from liability for a loss of flour by reason of its negligence
    or that of its agent in failing to properly care for the barge while being
    loaded.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497; Dec.
    Dig. § 141.*]

3. SHIPPING (§ 132*)—ACTION FOR INJURY TO CARGO—DEFENSES.
    It is not a defense to an action by a shipper against a vessel owner to
    recover the value of goods lost through the latter's negligence that the
    goods were fully insured and the insurance has been paid to libelant, al-
    though it does not appear from the pleadings or evidence that the suit is
    brought by the direction or for the benefit of the insurer.
    [Ed. Note.—For other cases. see Shipping. Dec. Dig. § 132.*]

In Admiralty. Suit for injury to cargo.

Page, McCutchen & Knight, for libelants.
A. L. Levinsky, for respondent.

DE HAVEN, District Judge. The libelants seek, in this action,
to recover damages from the respondent on account of an alleged
breach of contract. The contract was verbal, and it appears from the
evidence that by its terms the respondent agreed to transport for
libelants in open barges a quantity of flour from South Vallejo to the
port of Stockton for 65 cents per ton, the libelants to assume the
risks of carriage, and to unload the flour, at their own expense, up-
on its arrival at the port of destination. The flour was, at the date
of the contract, in the warehouse of the Port Costa Milling Company,
at South Vallejo, and was to be delivered by that company to re-
spondent upon the wharf, alongside the barges upon which it was to
be carried. Some time after the contract was made, and before any
flour was delivered to respondent thereunder, the libelants request-
ed the respondent to employ the Port Costa Milling Company, to con-
tinue the delivery of the flour from the wharf onto the barges; that
is, to take the flour from the wharf and load it on the barges. The
reason for the request was that, as the flour belonged to different own-
ers, it required segregation in order to facilitate its delivery at Stock-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ton, and it was thought this segregation could be more easily made by the employés of the warehouse company, in loading the barge than by stevedores brought by the respondent from Port Costa for that purpose. This was agreed to by the respondent, and the Port Costa Milling Company was employed by it to load the flour. The respondent then towed one of its barges, the Jersey, to South Vallejo, and the work of loading was commenced by the stevedores of the Port Costa Milling Company. The barge was brought to the wharf bow on, for the purpose of receiving her cargo, and, when in this position, the water was deep under her stern and more shallow at the bow. The work of loading progressed for two days, during which time about 300 tons of flour was placed on the barge. On the morning of the third day it was discovered that the barge was leaking through seams at the stern. Her bow was at this time resting in the mud, and the stern was still afloat, but lower than the bow. An unsuccessful effort was made to pump the water from the barge, and her stern sunk in the waters of the bay, and part of the flour with which she was laden was thereby damaged. The evidence shows that the bow of the barge grounded during the night when there was no one on her, nor at the wharf where she was being loaded, to care for her; and it does not appear that any one was charged by the respondent with the special duty of looking out for her, and keeping her bow away from the wharf, and in the deep water of the channel, when the tide ebbed, unless that obligation rested upon the Port Costa Milling Company by virtue of its employment to load the barge.

1. The damage to libelants' flour resulted from the sinking of the Jersey; but I think it clearly appears from the evidence that the barge was in a seaworthy condition when brought to South Vallejo by the respondent, that she was subsequently rendered unseaworthy by the opening of the seams in her stern, and that this was caused by the strain to which she was subjected when lying at the wharf partly aground, and that she was thus rendered unseaworthy by the failure to take any precaution to keep her bow from grounding while lying at the wharf. The failure to take such precaution was negligence, and I am of the opinion that this negligence was that of the respondent. It is undoubtedly true, as claimed by respondent, that where a shipper, for his own convenience, undertakes to load his goods upon a vessel, he must himself bear any loss occasioned by the negligence of himself or servants in so doing. But the evidence does not bring this case within the rule just stated. The Port Costa Milling Company was employed by the defendant to load the Jersey, and was paid by the respondent for that service. The Port Costa Milling Company was the agent of the respondent in loading the barge, and therefore its negligence in that matter, and that of the men who were employed by it to do the work, is for the purposes of this case to be deemed the negligence of respondent. The fact that the warehouse company was so employed upon the suggestion of the libelants did not release the respondent from the obligation of its contract to attend and care for the barge and its cargo while the work of loading was being done. Certainly there is nothing in the evidence to justify a finding that the

Jersey was ever placed under the control of the libelants, or that there was any express or implied agreement upon their part to care for her; or the cargo, while at the South Vallejo wharf.

2. Nor did libelants, by their contract assuming the risks of transportation, assume the risk of respondent's negligence in the loading of the Jersey, or any negligence of respondent or its agents by which she might be rendered unseaworthy while engaged in taking the flour on board. New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. 344, 382, 383, 12 L. Ed. 465. While it is true the carrier may limit the extent of its common-law liability as an insurer of goods intrusted to it for carriage, still "the rule is as well settled and almost as universally maintained that the carrier cannot contract to relieve itself from liability for loss or injury which is the result of its own negligence or that of its servants." Moore on Carriers, p. 287. And again, on page 319, the same author says:

"But a common carrier is not released from damages, occurring through his own negligence, by stipulating that the goods are shipped 'at the owner's risk.' At most that would only protect against loss occurring from the ordinary and known risks of transportation."

3. It appears from the evidence that the flour referred to in the libel was insured by libelants for its full value, and that prior to bringing this action they were paid in full by the insurer for all the damage sustained by them on account of the sinking of the Jersey. The libel does not mention this fact, nor is it alleged that the action is prosecuted for the benefit of the insurer, nor is there anything in the evidence tending to show that the action is being prosecuted for the benefit of the insurer in the name of the libelants by direction of the insurer. It is claimed by respondent that upon this state of facts the action cannot be maintained, because libelants are not the real parties in interest. That upon these facts the insurer could have maintained the action in its own name or that of the libelants, or that the action could be maintained by the libelants if the libel expressly averred that they were prosecuting for the use of the insurer, is well settled. Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 94 Fed. 180, 36 C. C. A. 135; Phœnix Insurance Co. v. Eris Transportation Co., 117 U. S. 312, 6 Sup. Ct. 750, 29 L. Ed. 873; Liverpool & Great Western Steam Co. v. Phœnix Insurance Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788; United States v. American Tobacco Co., 166 U. S. 468, 17 Sup. Ct. 619, 41 L. Ed. 1081. My attention has not been called to any case in which it has been directly held that when the shipper sues for the loss of his goods, in his own name, and, so far as disclosed by the proceedings and evidence, without the direction of the insurer, and without specially alleging that the action is prosecuted for the benefit of the insurer, the carrier may successfully defend against such action upon the ground that such goods were insured and the insurance thereon paid to the shipper. In Phœnix Insurance Co. v. Eris Transportation Co., 117 U. S., the court, at page 321, 6 Sup. Ct., at page 753 (29 L. Ed. 873), says:

"From the very nature of the contract of insurance as a contract of indemnity, the insurer, when he has paid to the assured the amount of the indemnity

agreed on between them, is entitled, by way of salvage, to the benefit of anything that may be received, either from the remnants of the goods, or from the damages paid by third persons for the same loss. But the insurer stands in no relation of contract or of privity with such persons. His title arises out of the contract of insurance, and is derived from the assured alone, and can only be enforced in the right of the latter. In a court of common law, it can only be asserted in his name, and, even in a court of equity or of admiralty, it can only be asserted in his right. In any form of remedy, the insurer can take nothing by subrogation but the rights of the assured."

Such being the well-settled rule of law, it has been held—

"that, if the assured recover before payment by the insurers, the recovery stands as a credit against the insurance; if recovery is after payment by the insurers, the assured holds it as trustee for the latter." The St. John (D. C.) 101 Fed. 469, 473.

And in the case of The Potomac, 105 U. S. 630–634, 26 L. Ed. 1194, the Supreme Court said:

"The mere payment of a loss by the insurer does not indeed afford any defense, in whole or in part, to a person whose fault has been the cause of the loss, in a suit brought against the latter by the assured. But upon familiar principles, often recognized by this court, the insurer acquires by such payment a corresponding right in any damages to be recovered by the assured against the wrongdoer, or other party responsible for the loss, and may enforce this right by action at common law in the name of the assured, or, when the case admits of proceeding in equity or admiralty, by suit in his own name."

The insurance company has not intervened for the protection of its rights, but under the law, as above stated, it will be entitled to receive from libelants the amount recovered in this action, and it would seem to be a matter of no concern to the respondent that the action is brought in the name of the libelants without disclosing that it is for the benefit of the insurer, as the judgment herein will protect it against any subsequent claim which may be made against it by the insurance company on account of the matters alleged in the libel.

Let a decree be entered in favor of the libelants for the damages sustained by them, and costs, and the case will be referred to United States Commissioner Krull, to ascertain and report the amount of such damages.